[S.F. No. 23631. May 30, 1978.]

BAXTER RICE, as Director, etc., Petitioner, v.
ALCOHOLIC BEVERAGE CONTROL APPEALS BOARD,
Respondent;
CHRISTINE T. CORSETTI et al.,
Real Parties in Interest.

[S.F. No. 23632. May 30, 1978.]

YOUNG'S MARKET COMPANY et al., Petitioners, v.
ALCOHOLIC BEVERAGE CONTROL APPEALS BOARD,
Respondent;
CHRISTINE T. CORSETTI et al., Real Parties in Interest.

**COUNSEL**

Evelle J. Younger, Attorney General, L. S. Porter, Assistant Attorney General, Hal Teasdale and Matthew P. Boyle, Deputy Attorneys General, for Petitioner in No. 23631.

Kurt W. Melchior, Edmund T. King II, Hale Kronenberg, Terry T. Lewis, Lawrence A. Hobel and Severson, Werson, Berk & Melchior as Amici Curiae on behalf of Petitioner in No. 23631.

Ball, Hunt, Hart, Brown & Baerwitz, Joseph A. Ball, Michael J. Maloney and E. Willcox Clarke, Jr., for Petitioners in No. 23632 and as Amici Curiae for Petitioner in No. 23631.

Wright & Thompson, Crispus A. Wright and Leon Thompson as Amici Curiae on behalf of Petitioners.

Floyd R. Mitzner and William D. Figg-Hoblyn for Respondent.

Donald A. Tenenbaum and Allen Ruby for Real Parties in Interest.

Stroock & Stroock & Lavan, Michael M. Umansky, Henry J. Silberberg, Linda T. Abrams, A. Kirk McKenzie, Harry M. Snyder, Joseph P. Freitas, Jr., District Attorney (San Francisco), Raymond T. Bonner, Assistant District Attorney, Edwin L. Miller, Jr., District Attorney (San Diego), and Robert C. Fellmeth, Deputy District Attorney, as Amici Curiae on behalf of Respondent and Real Parties in Interest.

## OPINION

**MOSK, J.**—Section 24755 of the Business and Professions Code requires that a manufacturer or brand owner file with the Department of Alcoholic Beverage Control (department) a minimum price schedule for distilled spirits which bear the brand name of the owner (subds. (a), (c)), and it prohibits an off-sale retail licensee from selling at less than that prescribed price (subd. (f)).[1] In this proceeding, we are called upon to decide whether this provision and the regulations of the department implementing it (Cal. Admin. Code, tit. 4, § 99, subd. (a)) conflict with

[1]All references will be to the Business and Professions Code unless otherwise noted.

Section 24755 provides in part: "(a) No package of distilled spirits which bears the brand, trademark or name of the owner or person in control shall be sold at retail in this state for consumption off the license premises unless a minimum retail price for such package first shall have been filed with the department in accordance with the provisions of this section.

"(b) A price for each of such packages shall be in a minimum retail price schedule setting forth with respect to each package the exact brand, trademark or name, capacity, and type of package, type of distilled spirits, age and proof, where stated on the label, and the minimum selling price at retail. The price for any such package may be filed separately and differently for the trading area of southern California and the trading area of northern California. The trading area of southern California shall consist of the Counties of Santa Barbara, Ventura, Los Angeles, Orange, Riverside, San Bernardino, Imperial and San Diego. The northern California trading area shall consist of the other counties of the state. No more than one person shall file a schedule for the same package for the same trading area.

"(c) Such schedule shall be filed by (1) the owner of the brand, if licensed in the state; (2) any licensee, other than a retailer, selling the brand and who is authorized in writing by the brand owner to file such schedule if the brand owner is not licensed in this state; (3) a manufacturer or rectifier licensed in this state and who bottles under the brand owned by a retailer; or (4) any licensee with the approval of the department, if the owner of the brand does not file or is unable to file a schedule or authorize a licensee other than a retailer to file such schedule.

"(d) Schedules filed pursuant to this section may be amended, changed, or modified by filing such amendments, change, or modification with the department on or before the 15th day of any month to take effect on the first day of the second succeeding calendar month; except that prices filed for a brand, size, or type not included in a schedule in effect at the time such brand, size, or type is filed, and prices filed to meet the price of a competitive brand, may be filed on or before the 15th day of any month to take effect on the first day of the following month. For the purpose of this section, a competitive brand shall mean any brand of the same type of distilled spirits having a filed selling price at retail within one dollar ($1) per gallon of the brand for which a competitive price is filed.

"The department shall reject any price schedule which does not comply with this subdivision.

"(e) A price schedule or amendment, change or modification thereof as provided for by this section shall be deemed filed when received, either by personal delivery or mail, at the headquarters office of the department in Sacramento. Upon such filing, a price schedule or amendment, change or modification thereof shall become a public record. Such filing of a price schedule or amendment, change or modification thereof shall constitute constructive notice of its contents to any licensee affected thereby.

"(f) No off-sale licensee shall sell any package of distilled spirits at any price less than

the Sherman Antitrust Act (15 U.S.C. § 1 et seq.), which declares combinations in restraint of trade illegal.[2]

On November 25, 1975, real parties in interest, Christine and Richard Corsetti (Corsetti), doing business as Bob's Market, sold a bottle of Christian Brothers brandy to an employee of the department for $1.80 less than the posted price, and one of Courvoisier cognac for $1.75 less than the posted price. On December 4, they sold two bottles of Johnny Walker scotch whiskey and two bottles of Christian Brothers brandy for $2.30 and $2.58 less than the posted price, respectively. After a hearing, the department suspended Corsetti's license for 10 days. On appeal to the Alcoholic Beverage Control Appeals Board (the board), Corsetti sought to have the order of the department annulled, claiming that section 24755 is invalid as a violation of the Sherman Antitrust Act (Sherman Act), and that it violates equal protection of the laws. The board agreed with these contentions and reversed the decision of the department.[3] █ The department seeks to annul the board's order.[4]

The two issues we must consider in deciding the constitutionality of section 24755 are whether the section violates the Sherman Act, and if so,

the effective filed price of such package unless written permission is granted by the department, for good cause shown and for reasons not inconsistent with this division."

[2]For convenience, we shall refer only to section 24755 in our discussion. Obviously, our conclusion regarding the validity of the provision will also apply to the department's rule implementing the section.

[3]Corsetti also asserted before the board that the evidence was insufficient to support the findings that he had violated section 24755, and that the penalty was improper. The board upheld the department's findings in these respects, and Corsetti does not challenge these aspects of the board's decisions.

[4]Young's Market Company and other wholesale distributors of alcoholic beverages (Young's) also sought review. However, their petition must be denied because they were not parties to the proceedings before the board.

Under article XX, section 22, of the California Constitution, orders of the board are subject to judicial review "upon petition of . . . any party aggrieved by such order." Section 23090 allows "any person" affected by a final order of the board to apply for a writ of review. However, section 23090.3 states that the "board . . . and each party to the action or proceeding before the board shall have the right to appear in the review proceeding," and under section 23090.4, a copy of the pleadings must be served "on each party" who appeared before the board.

We hold that these provisions read as a whole, limit the right of review of the board's decision to parties who appeared before the board. This limitation is consistent with the rule followed by appellate courts in reviewing the actions of trial courts. In such cases a person who is not a party of record to the proceeding below has no standing to appeal. (*Eggert* v. *Pac. States S. & L. Co.* (1942) 20 Cal.2d 199 [124 P.2d 815]; *City of Downey* v. *Johnson* (1968) 263 Cal.App.2d 775, 782 [69 Cal.Rptr. 830]; *People* v. *United Bonding Ins. Co.* (1969) 272 Cal.App.2d 441, 442 [77 Cal.Rptr. 310].) Young's Market did not appear below and therefore has no right to seek review here.

whether the Twenty-first Amendment to the United States Constitution nevertheless affords the states sufficiently broad powers over the sale and distribution of alcohol that fair trade laws pertaining to alcohol are valid despite the conflict.

Section 2 of the Twenty-first Amendment provides, "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." The Sherman Act, which derives its authority from the commerce clause (U.S. Const., art. I, § 8, subd. (3)) would, of course, prevail over state fair trade laws under the supremacy clause (U.S. Const., art. VI, § 2), unless the special powers granted to the states over alcohol by the Twenty-first Amendment allow the states to enact such laws.

I

Before reaching the merits of the issues before us, it is helpful to review the history of the federal and state statutes upon which our decision turns.

As originally enacted in 1890, section 1 of the Sherman Act contained a single simple sentence: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." (26 Stat. 209.) In 1937 Congress passed the Miller-Tydings Act as an amendment to section 1. The amendment excepted from the provisions of the section "contracts . . . prescribing minimum prices for the resale" of certain commodities in intrastate commerce, if such contracts were lawful under state law. (50 Stat. 693.)

Some states, including California (Stats. 1933, ch. 260, p. 793) and Louisiana (La.Gen.Stats. § 9809.1 et seq.) had enacted so-called nonsigner provisions. These statutes authorized the imposition of a minimum price upon a retailer who had not entered into a contract with a wholesaler or distributor specifying such a price, if the wholesaler or distributor had concluded a contract for a minimum price with any retailer, i.e., all retailers were bound by a minimum price agreed to by any retailer. In *Schwegmann Bros.* v. *Calvert Corp.* (1951) 341 U.S. 384 [95 L.Ed. 1035, 71 S.Ct. 745, 19 A.L.R.2d 1119], the United States Supreme Court held a nonsigner provision in the Louisiana law invalid under the Sherman Act on the ground that the Miller-Tydings exception authorized states to allow the fixing of minimum prices only if a retailer consented

by contract with a wholesaler to abide by such prices, whereas the Louisiana statute coerced retailers to abide by a price to which they had not agreed.

In the year following the *Schwegmann* decision, Congress responded by passing the McGuire Act (66 Stat. 632), which declared that nonsigner provisions were not unlawful under the Sherman Act.

California initially allowed resale price maintenance only by contract between a retailer and wholesaler (Stats. 1931, ch. 278, p. 583) but, as we have seen, in 1933 a nonsigner provision was enacted.[5] It was not until 1961 that section 24755 was amended to allow control of the price of liquor by means of the filing with the department of a minimum retail price which all retailers are required to observe. The change from the nonsigner mode of controlling retail prices to the present price-posting system is one of form rather than substance. (*Samson Market Co.* v. *Alcoholic Bev. etc. Appeals Bd.* (1969) 71 Cal.2d 1215, 1220 [81 Cal.Rptr. 251, 459 P.2d 667].)

The board's determination that section 24755 violates the Sherman Act was based upon the repeal by Congress of the Miller-Tydings Act and the McGuire Act by the Consumer Goods Pricing Act of 1975 (89 Stat. 801), the public interest in free competition, and the "changed circumstances in law and fact" since this court upheld the validity of the retail price maintenance laws in *Allied Properties* v. *Dept. of Alcoholic Beverage Control* (1959) 53 Cal.2d 141 [346 P.2d 737] and *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control* (1966) 65 Cal.2d 349 [55 Cal.Rptr. 23, 420 P.2d 735].

The board reasoned as follows: The repeal of the Miller-Tydings Act and McGuire Act exemptions to the Sherman Act, as well as the repeal of California fair trade laws relating to products other than liquor (Stats. 1975, ch. 402, p. 878), reflects a growing apprehension that fair trade laws are not in the public interest. Price fixing for whatever purpose requires close scrutiny, and a number of recent studies have cast doubt upon the underlying justification for fair trade laws. These studies reveal that the absence of fair trade laws does not harm small business and has no significant effect upon the consumption of alcohol or temperance. The California consumer pays more than the residents of any other state for

---

[5]Section 24750 still allows fair trade contracts for the resale of alcoholic beverages, and section 24752 prohibits retail sales below that price, whether or not a party has signed the contract.

alcoholic beverages because of the fair trade laws; liquor distributors reap the benefit of these high prices. Price fixing among producers has "resulted in the elimination of any semblance of competition within the industry." In view of these factors, which demonstrate that there has been a change in circumstances since *Allied Properties* and *Wilke & Holzheiser, Inc.* were decided (citing *Brown* v. *Merlo* (1973) 8 Cal.3d 855 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505]; *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]), the retail price maintenance provision set forth in section 24755 is no longer justified.[6]

The board also determined that the Twenty-first Amendment does not "negate the commerce clause" and that under our decision in *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 11 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351], the objectives of the Sherman Act and the Twenty-first Amendment must be weighed against one another in order to determine which shall prevail. It concluded that, in view of the matters referred to above, the Sherman Act should govern, and that, since section 24755 is in conflict with the Sherman Act, it is invalid.

II

Our first inquiry is whether retail price maintenance provisions of section 24755 violate the Sherman Act in its present form, i.e., without the exemptions previously afforded by the Miller-Tydings Act and the McGuire Act.

We begin with the propositions that if the conduct of the liquor producers in fixing minimum retail prices did not have governmental sanction or if the imposition of minimum prices upon retailers was not required by the state, but was discretionary with the producer, there would be a clear violation of the Sherman Act. Justice Douglas, writing in *Schwegmann*, could hardly have been more emphatic on this point. As we have seen, *Schwegmann* declared invalid a nonsigner provision in Louisiana which allowed, but did not compel, liquor distributors to impose minimum prices upon retailers at a time when Congress had not yet enacted laws allowing such provisions as an exception to the Sherman Act. Justice Douglas declared, "It is clear from our decisions under the Sherman Act [citations] that this interstate marketing arrangement would

---

[6]The studies upon which the board based its determination will be discussed *infra*. The board based its conclusion that section 24755 violates equal protection of the laws upon these same "changed circumstances."

be illegal, that it would be enjoined, that it would draw civil and criminal penalties, and that no court would enforce it. Fixing minimum prices, like other types of price fixing, is illegal *per se.* [Citations.] Resale price maintenance was indeed struck down in *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.,* 220 U.S. 373. . . . The fact that a state authorizes the price fixing does not, of course, give immunity to the scheme, absent approval by Congress." (341 U.S. at p. 386 [95 L.Ed. at pp. 1043-1044].)

The department asserts, however, that the program involved here is not invalid because, unlike the circumstances in *Schwegmann,* a statute compels the imposition of minimum prices upon retailers, and, therefore the program is a sovereign act of the state exempt from the Sherman Act.

It is important to observe in this connection that the prices imposed upon the retailers are those determined in the sole discretion of the producers, and that the department does not participate in determining the minimum price, but only enforces the price set by the producers. Our attention has not been called to any other comparable scheme in the country—in which the state polices by means of sanctions prices established by private interests—that has been judicially found exempt from the Sherman Act without the immunity provided by the Miller-Tydings Act and the McGuire Act.

We reject the assertion of the department and amicus curiae that the discretion of the producer in setting minimum prices is not absolute and that the department has the power to set a maximum price if the figure listed by the producer is unreasonable. They rely upon article XX, section 22, of the California Constitution, which sets forth the powers of the department regarding licensing the sale of alcoholic beverages and the provision in subdivision (f) of section 24755 which allows the department to grant "written permission . . . for good cause shown and for reasons not inconsistent" with the retail price maintenance law to sell below the price listed by the manufacturer.

There is nothing in either article XX, section 22, or in subdivision (f) of section 24755 which authorizes the department to set maximum prices for the purpose of promoting competition among liquor producers. In only one case has the department attempted to set a different price for distilled spirits than that posted by the producer—*Schenley Affiliated Brands Corp.* v. *Kirby* (1971) 21 Cal.App.3d 177, 186 [98 Cal.Rptr. 609]—and it was there held that the department did not have such authority. We have not been referred to any instance in which the department allowed a retailer

to sell below the listed price "for good cause." Since a primary goal of the price maintenance program is asserted to be promotion of temperance, we seriously doubt that the setting of a maximum price by the department for the sole purpose of encouraging competition among producers would be consistent with the declared purpose of the program. Subdivision (f) appears to be directed to alleviating the hardship of an individual retailer who "for good cause" can show that he should be excepted from the minimum price requirement in a particular instance rather than authorizing the department to set maximum prices to enhance competition among producers.

On a number of occasions the United States Supreme Court has addressed the question whether the participation of a state in anticompetitive conduct is immunized from the Sherman Act. In *Parker* v. *Brown* (1943) 317 U.S. 341 [87 L.Ed. 315, 63 S.Ct. 307] and *Bates* v. *State Bar of Arizona* (1977) 433 U.S. 350 [53 L.Ed.2d 810, 97 S.Ct. 2691], the court held that the Sherman Act was not violated because the conduct involved was the sovereign act of the state which the Sherman Act did not prohibit. In *Cantor* v. *Detroit Edison Co.* (1976) 428 U.S. 579 [49 L.Ed.2d 1141, 96 S.Ct. 3110] and *Goldfarb* v. *Virginia State Bar* (1975) 421 U.S. 773 [44 L.Ed.2d 572, 95 S.Ct. 2004], a contrary conclusion was reached.

We proceed, then, to an analysis of these decisions to determine the principles which will exempt from the Sherman Act a price fixing program conducted under the auspices of the state.

*Parker* v. *Brown, supra,* 317 U.S. 341, the case in which the high court first enunciated the state action exemption, involved a California program designed to conserve the agricultural resources of the state and to prevent economic waste in the marketing of raisins. Under that scheme, if a given number of producers in a particular area petitioned for the establishment of a marketing plan for raisins and a commission appointed by the Governor found that such a plan would enhance the state's objectives without permitting unreasonable profits to producers, the Director of Agriculture appointed a committee of producers to formulate a program, which was designed to compel producers to sell a certain proportion of their raisins at a price determined by the committee of producers. The commission was required to approve the program suggested by the committee, and had the power to modify it. If a certain number of producers in the area accepted the program, it became effective throughout the area.

In finding no violation of the Sherman Act, the court reasoned in part that the marketing plan was never intended to operate by force of individual agreement but derived its authority and efficacy from the legislative command of the state, and that the Sherman Act was not designed to restrain a state or its officers from activities directed by its Legislature. It was held that, because the state had created the machinery for establishing the program and had adopted and enforced it, acting through the commission, the restraints were imposed as an act of government which was not prohibited by the Sherman Act. It is the state "which adopts the program and which enforces it," the court emphasized. (317 U.S. at p. 352 [87 L.Ed. at p. 326].)

*Cantor* v. *Detroit Edison Co., supra,* 428 U.S. 579, is significant not only because of its holding on the facts involved there, but because of its analysis of the state action exemption laid down in *Parker.* In *Cantor,* the Detroit Edison Company, which was the sole distributor of electricity in southeastern Michigan, supplied consumers with almost 50 percent of standard-size light bulbs. The charge for the bulbs did not appear separately in the billing, but was included in the general charges for electricity. This billing system and the rates charged by Detroit Edison were both approved by the Michigan Public Service Commission and could not be altered without the commission's approval. Petitioner was a retail druggist who filed a complaint against the utility, alleging that it was using its monopoly power in the distribution of electricity to restrain competition in the sale of bulbs, in violation of the Sherman Act.

The Supreme Court held that the state action exemption did not shield the utility from a charge of violating the act because the light bulb program did not implement a statewide policy, which was neutral on the question whether the utility should have such a program, and that the decision to institute the program was made by the utility and was merely approved by the regulatory body.

The analysis in *Cantor* of the prior holding in *Parker* is of interest. After discussing the contentions at some length, the court pointed out that Chief Justice Stone in *Parker* "carefully selected language which plainly limited the Court's holding to official action *taken by state officials.*" (Italics added; 428 U.S. at p. 591 [49 L.Ed.2d at p. 1150].) In a footnote, the court observed that Chief Justice Stone made 13 references in *Parker* to the fact that state action was involved and that "[e]ach time his language was carefully chosen to apply only to official action, as opposed to private action approved, supported, or even directed by the State . ... .

[¶] The cumulative effect of these carefully drafted references unequivocally differentiates between official action on the one hand, and individual action (*even when commanded by the State*), on the other hand." (Italics added; *id.,* at p. 591, fn. 24 [49 L.Ed.2d at p. 1150].) Other passages in the *Cantor* opinion make it clear that *Parker* did not hold that the state action exemption applies to anticompetitive conduct which the state either approves or directs private parties to perform.[7]

*Goldfarb* v. *Virginia State Bar, supra,* 421 U.S. 773, considered state action under the Sherman Act in a different context. There, the question presented was whether adherence by attorneys to a fee schedule recommending minimum prices for common legal services published by a county bar association violated the act. Although membership in the association was voluntary, enforcement of the minimum fees was provided by the Virginia State Bar, the administrative agency through which the Virginia Supreme Court regulated the practice of law. The court held that this constituted a "classic illustration of price fixing" which was not immunized from the prohibitions of the Sherman Act. In distinguishing *Parker,* the *Goldfarb* court pointed out that the state did not compel the bar association to adopt minimum fees, whereas in *Parker* the program was required by the state, acting as sovereign.

The fourth and most recent case involving the state action exemption is *Bates* v. *State Bar of Arizona, supra,* 433 U.S. 350, in which it was held that a rule of the Arizona Supreme Court prohibiting attorneys from advertising was exempt from the Sherman Act. The court distinguished *Goldfarb* on the ground that there the anticompetitive activity was not required by the state, whereas, since the Arizona Supreme Court was the "ultimate body wielding the State's power over the practice of law" the restraint was " 'compelled by direction of the State acting as a sovereign.' " (433 U.S. at p. 360 [53 L.Ed.2d at p. 821].) *Cantor* was distinguished on several grounds: the claim in *Cantor* was directed against a private party; the state had no independent regulatory interest in the market in light bulbs, and the program was instigated by the utility, with

---

[7]For example, the court declares that *Goldfarb* (discussed *infra*) cannot be read as a "guarantee that compliance with any state requirement would automatically confer federal antitrust immunity" (428 U.S. at p. 600 [49 L.Ed.2d at p. 1155]) and the opinion approves a caveat in *Parker* that " 'a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful' " (428 U.S. at p. 602 [49 L.Ed.2d at p. 1156]).

We note that in a recent case involving the application of the state action exemption to a subdivision of the state, the United States Supreme Court distinguished *Cantor* on the ground that it involved anticompetitive activities of private parties. (*City of Lafayette* v. *Louisiana Power & Light Co.* (1978) 435 U.S. 389 [55 L.Ed.2d 364, 98 S.Ct. 1123].)

only the acquiescence of the state regulatory commission. In *Bates,* by contrast, the Arizona Supreme Court which adopted the rules was the real party in interest, control over advertising by attorneys had long been the subject of the state's oversight, the rule prohibiting advertising reflected a clear articulation of state policy, and the Arizona State Bar acted as the agent of the court and under its direct supervision. Significantly, the court also relied upon the fact that the rule was "subject to pointed re-examination by the policy maker—the Arizona Supreme Court—in enforcement proceedings." Thus, it was held, the concern that federal policy was being unnecessarily subordinated to state policy was reduced. It was deemed significant that state policy "is so clearly and affirmatively expressed and that the State's supervision is so active." (433 U.S. at p. 362 [53 L.Ed.2d at p. 822].) The high court nevertheless invalidated the Arizona rule on the ground that it violated the First Amendment because of overbreadth.

We attempt, then, to isolate the characteristics which will qualify a program or rule as a sovereign act of the state so as to exempt it from the Sherman Act. It is clear that no exemption applies if the anticompetitive act is performed by a private association and is not compelled by the state (*Goldfarb*) or if the state merely approves anticompetitive conduct initiated by a private agency and the program does not effectuate any statewide policy (*Cantor*). It does not follow, however, that conduct by private parties under compulsion of state law is necessarily immune from the Sherman Act even if such conduct is designed to carry out a policy of the state.

The heart of the issue is whether the sovereign act of the state which will immunize a price fixing law from the Sherman Act must be either the act of the state itself or one over which the state has the ultimate power of decision, or whether it is sufficient to invoke the exemption if, as in the program we here consider, the state compels private persons to engage in anticompetitive conduct and essentially exercises no control over the substance of their actions.

As mentioned above, we have discovered no decision which has gone so far as to hold that a program comparable to that prescribed in section 24755 is exempt from the Sherman Act as being valid state action.

Neither *Parker* nor *Bates,* the two cases which found exemptions from the Sherman Act on the ground of state action, involved private conduct the substance of which was totally unconfined by state regulation. In

*Parker,* although private persons had some voice in determining whether the prorate program should be instituted for a particular area, the final authority over the prices set in the program, as well as other details thereof was in the commission, a creature of the state, whose members were appointed by the Governor. In effect, the committee of producers which formulated the program and submitted it to a referendum merely had the right to recommend a program to the commission, which was required to approve the scheme and had the discretionary power to make modifications. *Cantor* could hardly have made it clearer that the *Parker* rule immunizes official action taken by state officers from the strictures of the Sherman Act, but that *Parker* did not decide private action condoned or directed by the state was exempt from the act. (Note, *Parker v. Brown Revisited: The State Action Doctrine After Goldfarb, Cantor, and Bates* (1977) 77 Colum.L.Rev. 898.)

In *Bates* the rule prohibiting advertising was a direct order of the state, acting through the Arizona Supreme Court. Even so, the court emphasized that the directive was subject to "pointed re-examination" by the Arizona court and its administration was actively supervised by the court so as to reduce the likelihood that federal antitrust policy would be unnecessarily subordinated to state policy.

In the price maintenance program before us, the state plays no role whatever in setting the retail prices. The prices are established by the producers according to their own economic interests, without regard to any actual or potential anticompetitive effect; the state's role is restricted to enforcing the prices specified by the producers. There is no control, or "pointed re-examination," by the state to insure that the policies of the Sherman Act are not "unnecessarily subordinated" to state policy. Thus, in our view, we would be extending the decisions of the United States Supreme Court beyond their intended design if we were to hold, as the department urges, that this scheme is immune from the Sherman Act.

The department asserts, however, that whatever congressional intent may have been with respect to exempting products other than liquor from the Sherman Act, the report of the Senate Judiciary Committee, which recommended repeal of the Miller-Tydings Act and the McGuire Act, made it clear that fair trade laws will not prohibit manufacturers of alcohol from enforcing resale prices in states which pass price fixing statutes pursuant to the Twenty-first Amendment.[8] This statement in the

---

[8]The report states, "Liquor will not be affected by repeal of the fair trade laws in the same manner as other products because the Twenty-First Amendment to the Constitution

report represents only an opinion that the Twenty-first Amendment will allow continuation of price fixing for liquor in those states which properly allow such conduct—an issue which we discuss *infra*. We do not view this opinion as a declaration of antitrust policy. There is a "heavy presumption against implicit exemptions" to the Sherman Act (*Goldfarb, supra,* 421 U.S. 773, at p. 787 [44 L.Ed.2d 572, at p. 585]), and we conclude that the statement in the Senate report relied upon by the department does not allow us to read into the Sherman Act an exemption for liquor fair trade provisions which the act itself does not contain.

### III

We consider next the department's contention that we are bound by prior decisions of this court to hold that section 24755 is not in conflict with the Sherman Act. The department places primary reliance upon *Samson Market Co.* v. *Alcoholic Bev. etc. Appeals Bd., supra,* 71 Cal.2d 1215. In *Samson,* we were called upon to decide whether the change from the nonsigner method of controlling retail liquor prices to the present system of requiring the filing of minimum retail prices with the department violated the Sherman Act. We held that this change in the "mechanism" of fixing prices did not create a conflict with the Sherman Act. The department seizes upon this statement as a holding that section 24755 does not violate the Sherman Act as amended in 1975.

This contention is clearly without merit. The thrust of our holding in *Samson* was that the change in methodology did not amount to a difference in "substance and practical effect" so that our prior holding that the nonsigner provision did not unlawfully delegate legislative power to fix prices applied with equal force to the means now specified in section 24755. Moreover, *Samson* was decided in 1969, six years before the repeal of the McGuire Act. Thus, if we had addressed ourselves directly to the question, we would have been compelled to conclude that section 24755—the provisions of which are identical "in substance and practical effect" to the nonsigner provision then exempted from the antitrust laws—was not in conflict with the Sherman Act.[9]

gives the States broad powers over the sale of alcoholic beverages. Thus while repeal of the fair trade laws generally will prohibit manufacturers from enforcing resale prices, alcohol manufacturers may do such in States which pass price fixing statutes pursuant to the Twenty-First Amendment." (1975 U.S. Code, Cong. & Admin. News, at pp. 1569, 1571.)

[9]The exemptions under the Miller-Tydings Act and the McGuire Act covered contracts relating to products in free and open competition with commodities of the same general class produced by others. Section 24755 does not contain a requirement for a contract, nor

Nor do *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control, supra,* 65 Cal.2d 349, or *Allied Properties* v. *Dept. of Alcoholic Beverage Control, supra,* 53 Cal.2d 141, conflict with our conclusion that section 24755 violates the Sherman Act. Neither of those cases considered this issue; at the time they were decided fair trade laws involving liquor as well as other products were exempted from the antitrust laws by the Miller-Tydings Act and the McGuire Act.

IV

We must next consider whether the Twenty-first Amendment permits California to fix resale prices of distilled spirits in spite of the Sherman Act. As we have seen, section 2 of the amendment provides, "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." The department contends this provision insulates price fixing of liquor authorized by a state from the prohibitions of the Sherman Act.

The board rejected this contention. It relied upon decisions holding the Twenty-first Amendment had not *pro tanto* repealed the commerce clause and which emphasized that the policies of each must be considered when they conflict. The board found the state's fair trade laws illsuited to perform their intended function, and consequently found that California's interest in continued operation of those laws was outweighed by the firm federal policy prohibiting price fixing, which would be frustrated if the fair trade statutes were upheld. Consequently, it tipped the balance in favor of the commerce-clause-based Sherman Act, and against the state regulations. The department contests the conclusion and the process by which it was reached by the board.

It is axiomatic that consideration of any state regulation of intoxicating beverages must begin with the Twenty-first Amendment. Yet

the requirement that the liquor products to which the price posting provisions apply be in competition with one another. Based upon these differences, the department urges that the price posting program contained in section 24755 was not exempt from the Sherman Act, and therefore the statement in *Samson* that the section does not conflict with the Sherman Act is a direct holding on the issue now before us. We reject this assertion, for we held in *Samson* that the price posting program in section 24755 was in substance and effect identical to the nonsigner provision in the pre-1961 version of the section. Thus, the absence of a fair trade contract was deemed to be of no significance. Moreover, it has been held that free and open competition among the alcoholic beverages to which the section applies may be presumed. (*Reimel* v. *Alcoholic Bev. etc. Appeals Bd.* (1967) 256 Cal.App.2d 158, 173-174 [64 Cal.Rptr. 26].)

it is equally clear the inquiry does not terminate at that point. After *Hostetter* v. *Idlewild Liquor Corp.* (1964) 377 U.S. 324 [12 L.Ed.2d 350, 84 S.Ct. 1293], and *Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d 1, it is settled that states do not have plenary powers over all matters relating to alcoholic beverages. When a statute enacted pursuant to the Twenty-first Amendment conflicts with an enactment based on the commerce clause, we must balance the policies furthered by each in order to determine which should prevail.

*Hostetter* was the first explicit articulation of the need to consider the commerce clause and the constitutional amendment in juxtaposition. In *Hostetter* a liquor retailer sold alcohol only to international airline passengers for use at their foreign destinations. It was claimed New York could not impose a state liquor license requirement upon the retailer because of the commerce clause. The Supreme Court agreed with this contention and rejected the state's claim of absolute power under the Twenty-first Amendment to regulate the passage of liquor through its territory.

The court summarized the line of cases commencing with *State Board* v. *Young's Market Co.* (1936) 299 U.S. 59 [81 L.Ed. 38, 57 S.Ct. 77], which declared that states were "totally unconfined" by traditional commerce clause limitations in restricting the importation of intoxicants. After reviewing *Young's Market* and its progeny, the court noted, "To draw a conclusion from this line of decisions that the Twenty-first Amendment has somehow operated to 'repeal' the Commerce Clause wherever regulation of intoxicating liquors is concerned would, however, be an absurd oversimplification. If the Commerce Clause had been *pro tanto* 'repealed,' then Congress would be left with no regulatory power over interstate or foreign commerce in intoxicating liquor. Such a conclusion would be patently bizarre and is demonstrably incorrect. . . . [¶] Both the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution. Like other provisions of the Constitution, each must be considered in the light of the other, and in the context of the issues and interests at stake in any concrete case." (*Id.,* at pp. 331-332 [12 L.Ed.2d at p. 356].)

In *Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d 1, we emphasized in even stronger terms the necessity of accommodating the policy of the Twenty-first Amendment to other fundamental policies. There, a state statute precluding the employment of women as bartenders was chal- lenged under article XX, section 18, of the California Constitution, the

federal Civil Rights Act, and the equal protection clauses of the state and federal Constitutions. First, we held the statute violative of article XX, section 18, which prohibits disqualification for any vocation on account of sex.[10] Next, we found the statute also violated the nondiscriminatory hiring provisions of the Civil Rights Act, flatly rejecting the claim that the Twenty-first Amendment precludes federal interference with state regulation of alcohol. Refusing to accept the facile interpretation of the amendment which was offered by the state, we noted, "Although some early cases painted state powers under section 2 of the Twenty-first Amendment with a broad brush, later decisions have taken a position more in keeping with the original intent of the amendment . . . . [¶] Thus it is apparent that the Twenty-first Amendment not only does not reach all alcoholic beverage cases which would otherwise fall within Congress' commerce clause powers, but even in those situations covered by the express language of the amendment, *some balancing and accommodation must take place.*" (*Id.,* at p. 12; italics added.)

The department attempts to overcome the explicit adoption by *Hostetter* and *Sail'er Inn* of a balancing approach by raising several contentions. First, it focuses on *Seagram & Sons* v. *Hostetter* (1966) 384 U.S. 35 [16 L.Ed.2d 336, 86 S.Ct. 1254]. That case presented a challenge to a New York statute which was designed to eliminate the lingering effects of an earlier liquor resale price maintenance scheme. The statute required liquor wholesalers and retailers to affirm to the liquor authority of the state that their New York prices were no higher than prices at which similar liquor was sold anywhere in the United States during the preceding month. The court upheld the statute against challenges based upon the due process, equal protection and commerce clauses.

The department contends *Seagram & Sons* distinguished *Hostetter* as a case in which state regulation was struck down because it was regulating liquor not destined for use in the state. According to the department, state power to regulate intoxicants which will be used in the state remains virtually unconditional.

We do not read *Seagram & Sons* as stating such a broad rule. While the court did make a distinction between the case there under consideration and *Hostetter* on the ground that the latter involved regulation of liquor for use outside the state, whereas the rule considered in *Seagram & Sons* related to liquor to be consumed within the regulating state, the distinction was made for the purpose of determining whether the

---

[10]This provision was amended in 1974 and renumbered section 8 of article I.

regulation placed an unconstitutional burden on interstate commerce. (384 U.S. at p. 45 [16 L.Ed.2d at p. 344].) After concluding that no such burden was established, the court went on to determine whether, under the supremacy clause, there was a conflict between the state's price regulation and the Sherman Act and other federal antitrust statutes. If, as the department contends, state regulation of liquor to be used within the state is immune from attack because the Twenty-first Amendment affords states plenary powers over liquor consumed within their borders, free of the restrictions imposed by the Sherman Act, there would have been no necessity for the court to discuss the merits of the antitrust claims.

Indeed, the court in *Seagram & Sons* acknowledged that the Twenty-first Amendment does not insulate state regulations which apply only to liquor consumed within a state from federal antitrust statutes, for it recognized that there was a potential conflict between the regulation involved there and federal law. (384 U.S. at p. 46 [16 L.Ed.2d at pp. 344-345].)[11]

Moreover, the distinction advanced by the department fails to take into account our decision in *Sail'er Inn*, which makes clear that state regulation of alcoholic beverages to be used within the state is still subject to a commerce clause enactment in certain circumstances.

The department also attempts to evade *Sail'er Inn*. It contends the decision turned primarily on our own constitutional provision, and in any event, is inapposite because the California statute regulated employment, not liquor. Neither distinction undercuts the central thrust of *Sail'er Inn*. While we could have grounded our decision solely on the California Constitution, we did not. We expressly considered the federal Civil Rights Act and gave detailed attention to whether it was negated by the Twenty-first Amendment. Nothing said detracts from its holding that a balancing process is required in deciding whether a state's power over liquor is plenary.

Next, the department relies upon *California* v. *LaRue* (1972) 409 U.S. 109 [34 L.Ed.2d 342, 93 S.Ct. 390]. In *LaRue* bar owners challenged the constitutionality of regulations of the department limiting the type of

---

[11]The department's views as to the reach of the Twenty-first Amendment are supported by *National Railroad Passenger Corporation* v. *Miller* (D.Kan. 1973) 358 F.Supp. 1321, and by dictum in *Washington Brewers Institute* v. *United States* (9th Cir. 1943) 137 F.2d 964, decided a number of years before *Hostetter*. Although the department attempts to distinguish *Schwegmann* on the ground that it involved an interstate marketing scheme, for the reasons stated above, we do not view that distinction as persuasive.

entertainment which could be presented in taverns holding liquor licenses. The regulations were upheld; the court found the Twenty-first Amendment gave them an added presumption of validity. *LaRue* did not, however, cast doubt on the need to accommodate and balance. The decision must be explained as a case in which the balance was struck in favor of the state regulation. Nowhere does *LaRue* state that the "added presumption" obviates the need to balance federal policy against a state's interest, or the Twenty-first Amendment against the commerce clause.

The most recent discussion of the Twenty-first Amendment reaffirms that the amendment does not except all state laws involving liquor from every commerce clause enactment. In *Craig* v. *Boren* (1976) 429 U.S. 190 [50 L.Ed.2d 397, 97 S.Ct. 451], an Oklahoma statute specifying different drinking ages for men and women was declared unconstitutional under the equal protection clause. The interest of the state in controlling liquor under the Twenty-first Amendment was held insufficient to overcome a challenge to the statute. The court stated, "[t]he Amendment primarily created an exception to the normal operation of the Commerce Clause. [Citations.] Even here, however, the Twenty-first Amendment does not *pro tanto* repeal the Commerce Clause, but merely requires that each provision 'be considered in the light of the other, and in the context of the issues and interests at stake in any concrete case.' " (*Id.,* at p. 206 [50 L.Ed.2d at p. 412].)[12]

## V

Therefore, we must undertake a balancing process in the present case. We must ascertain what policies are furthered by the state's system of permitting producers to fix retail prices, whether the retail price maintenance provisions clearly vindicate those policies, and whether and to what degree the policy underlying the Sherman Act is undermined by the state's program.

The purposes of the liquor price maintenance law are to promote temperance and orderly marketing conditions.[13] In *Allied Properties* v.

---

[12]It is beyond dispute that the Twenty-first Amendment does not permit states to enact liquor laws in disregard of the due process or equal protection clauses. *Wisconsin* v. *Constantineau* (1971) 400 U.S. 433 [27 L.Ed.2d 515, 91 S.Ct. 507], held a state law authorizing the "posting" of the names of excessive drinkers was not exempt from compliance with due process requirements. *Craig* v. *Boren, supra,* reaches the same result under the equal protection clause.

[13]Section 23001 provides: "This division is an exercise of the police powers of the State for the protection of the safety, welfare, health, peace, and morals of the people of the

*Dept. of Alcoholic Beverage Control, supra,* 53 Cal.2d 141, and *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control, supra,* 65 Cal.2d 349, we upheld the constitutionality of these laws against the challenge that they constituted an improper exercise of the police power. In making our determination, we were guided by the settled rule applicable to a claim that a statute exceeds the police power: "In passing upon the fair trade provisions we must be guided by the well-settled principles that the presumption is in favor of constitutionality and that the invalidity of an act of the Legislature must be clear before the statute can be declared unconstitutional. It is not our province to weigh the desirability of the social or economic policy underlying the statute or to question its wisdom; they are purely legislative matters. [¶] Where, as here, it is argued that a statute does not constitute a proper exercise of the police power, the inquiry of the court is limited to determining whether the object of the statute is one for which that power may legitimately be invoked and, if so, whether the statute bears a reasonable and substantial relation to the objects sought to be attained . . . . [¶] The means provided in a statute must be accepted as being reasonably designed to accomplish its objective unless it is unquestionable that they are improper." (53 Cal.2d 141, 146, 148.)

Applying this standard, we determined that the Legislature's objectives were valid and that the means employed were not patently improper. We held that the Legislature could rationally conclude that the public would be adequately protected against excessive prices by the ordinary play of competition among manufacturers, that the elimination of price cutting on the retail level would promote temperance, and that competition among the relatively few producers and wholesalers would not result in disorderly marketing conditions. Moreover, the provisions did not unlawfully delegate legislative power because, although producers of liquor, like manufacturers under the general fair trade law, set prices in

State, to eliminate the evils of unlicensed and unlawful manufacture, selling, and disposing of alcoholic beverages, and to promote temperance in the use and consumption of alcoholic beverages. It is hereby declared that the subject matter of this division involves in the highest degree the economic, social, and moral well-being and the safety of the State and of all its people. All provisions of this division shall be liberally construed for the accomplishment of these purposes."

Section 24749 provides: "It is the declared policy of the State that it is necessary to regulate and control the manufacture, sale, and distribution of alcoholic beverages within this State for the purpose of fostering and promoting temperance in their consumption and respect for and obedience to the law. In order to eliminate price wars which unduly stimulate the sale and consumption of alcoholic beverages and disrupt the orderly sale and distribution thereof, it is hereby declared as the policy of this State that the sale of alcoholic beverages should be subjected to certain restrictions and regulations. The necessity for the enactment of provisions of this chapter is, therefore, declared as a matter of legislative determination."

accordance with their own economic interests, they indirectly carried out the purposes of the Legislature. We observed in *Allied Properties* that most courts which had considered the issue had upheld the constitutionality of liquor fair trade laws.

In *Wilke & Holzheiser* we reconsidered our decision in *Allied Properties* in the face of a challenge based upon the circumstance that since 1959, when the latter was decided, a majority of states had held mandatory price maintenance provisions, nonsigner provisions or fair trade laws to be unconstitutional. We again emphasized that the Legislature's assumption that the price maintenance provisions would promote temperance and orderly marketing conditions were not unquestionably " ' "arbitrary and beyond rational doubt erroneous" ' " (65 Cal.2d at p. 361), and we reaffirmed our holding in *Allied Properties.*

In the present case, we are engaged in a different exercise. The connection between the means employed by the Legislature and the ends sought to be attained is not clothed with the same presumptions applied in considering an assertion that the state has exceeded its police power. Rather, as *Hostetter* and *Sail'er Inn* command, we must balance California's interest in promoting temperance and orderly marketing conditions by the method set forth in section 24755 against the policy underlying the Sherman Act.

That policy was cogently described by Justice Black in *Northern P. R. Co.* v. *United States* (1958) 356 U.S. 1, 4-5 [2 L.Ed.2d 545, 549, 78 S.Ct. 514]: "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition. . . ."

In the vindication of this policy any combination which tampers with the price structure is unlawful. Although the participants in a price fixing scheme may be in no position to control the market, to the extent that they raise, lower or stabilize prices they violate the act, and this is so even if the prices fixed are reasonable. (*U.S.* v. *Socony-Vacuum Oil Co.* (1940) 310 U.S. 150, 221-223 [84 L.Ed. 1129, 1167-1168, 60 S.Ct. 811];

*U.S.* v. *Trenton Potteries* (1927) 273 U.S. 392, 397 [71 L.Ed. 700, 705, 47 S.Ct. 377, 50 A.L.R. 989].)

It is well established that resale price fixing is illegal under the Sherman Act (*Schwegmann*) and we have concluded above that such conduct is not exempt from the act because it is performed under the compulsion of state law. The imposition of a retail price by a producer is a clear violation of federal law absent such an exemption.

The provision we here consider has the effect not only of allowing illegal vertical restraints on competition—i.e., resale prices specified by producers and imposed upon retailers—but horizontal restraints as well. Corsetti argued before the board, as he does in this court, that section 24755 is an "open invitation to price-fixing" among producers and that there is in fact no meaningful price competition among nationally advertised brands of liquor in California. The board agreed with this assertion.

Corsetti offers the following evidence: In July 1976, five leading brands of gin cost $4.89 for a fifth of a gallon,[14] and in July 1976, three of the five best selling brands of bourbon whiskey cost $5.49 a fifth, and the fourth cost 1 cent more.[15] Five leading brands of scotch whiskey sold for $8.39 or $8.40 a fifth in July 1976.[16] Between July 1971 and July 1976 the prices for the most popular brand of scotch (J&B) and the fourth leading scotch (Johnny Walker Red Label) were identical; a rise in the price of one was followed by a precise price rise in the other within the same month.[17]

[14]

| Brand | July 1955 | July 1961 | July 1966 | July 1971 | July 1976 |
|---|---|---|---|---|---|
| Gordon's | 4.25 | 4.29 | 4.29 | 4.69 | 4.89 |
| Gilbey's | 4.09 | 4.19 | 4.24 | 4.59 | 4.89 |
| Seagram's | 4.39 | 4.39 | 4.39 | 4.65 | 4.89 |
| Burton's | 3.89 | 3.99 | 3.99 | 3.99 | 4.89 |
| Schenley | 4.09 | 4.19 | 4.19 | 4.29 | 4.89 |

[15]In 1975 four of the five best selling bourbons in the United States were Jim Beam, Early Times, Old Crow and Ancient Age. The first three were posted at $5.49 a fifth in July 1976, and the last, Ancient Age, cost one cent more.

[16]

| Brand | July 1961 | July 1966 | July 1971 | July 1976 |
|---|---|---|---|---|
| Whitehorse | 6.59 | 7.05 | 7.50 | 8.40 |
| Haig & Haig | 6.69 | 7.07 | 6.49 | 8.39 |
| Vat 69 | 6.55 | 6.99 | 7.50 | 8.39 |
| J & B | 7.25 | 7.25 | 7.60 | 8.40 |
| J. Walker Red | 6.55 | 7.05 | 7.60 | 8.40 |

[17]In July 1961, a fifth of J&B cost $7.25, while a fifth of Johnny Walker Red cost $6.55. Five years later, J&B was still at $7.25 and Johnny Walker Red had risen to $7.05. By July

Moreover, as indicated in the margin, the price differential between leading brands of distilled liquor has gradually decreased since 1955 so that, for example, while there was a 50-cent difference between two of the five leading brands of gin in July 1955, the price of all five was exactly the same by July 1976, and although there was a 70-cent price difference between two of the five leading brands of scotch in July 1961, that difference was only 1 cent by July 1976.[18]

It was apparently on the basis of such evidence that a California Senate committee stated, in a report relied upon by the board, that the retail price maintenance system in California "has resulted in the elimination of any semblance of competition within the industry." (Sen. Select Com. Rep. on Laws Relating to Alcoholic Beverages (1974) vol. 1, p. 9.) The committee also concluded that because of the program, "the consumer pays about the highest retail prices for liquor, beer and wine in the country, although the state levies one of the lowest excise taxes on these beverages." (*Id.,* at pp. 82-83.)

It is urged that these statistics present an inaccurate picture because there are in fact wide differences in prices among liquors of the same type. In support of this assertion, figures are cited which indicate that there is a substantial difference in price between some brands of liquor of the same type,[19] and that there is a marked price differential between some roughly equivalent brands.[20] However, that there may be some interbrand competition does not detract from the circumstance that among leading brands there is a uniformity of price which persuasively demonstrates the absence of "free and unfettered competition" in the California liquor industry. Indeed, the posting system facilitates price fixing among producers. While it may be a per se violation of the

1971, the two had reached an identical price of $7.60 a fifth. In April 1972, both raised the price to $7.80 a fifth, where it remained until May 1974, when both raised their prices to $8.40 a fifth, and there it remained as of July 1976.

[18]The department and amicus curiae insist that we may not rely upon the figures proffered by Corsetti because they were not presented to the department. However, the information was derived from the price postings filed with the department pursuant to section 24755 and department rules. They were relied upon by the board, and we may take judicial notice of them. (Evid. Code, §§ 452, subd. (h), 459.)

[19]In April 1977 Lord Douglas scotch sold for $5.49 a quart, whereas Chivas Regal cost $15.79; Czarina Vodka was listed at $4.49 a quart and Smirnoff at $7.40; and the price for a quart of gin ranged from $3.81 for Smolka to $9.28 for Beefeater's.

[20]Johnny Walker Red Label scotch sold for $14.50 a quart while J&B Rare Scotch was $10.60 a quart; Smirnoff and Wolfschmidt Vodka sold for $7.40 and $6.50 a quart respectively, and Kessler brand blended whiskey was listed at $6.19 a quart whereas Seagram 7 Crown sold for $5.99.

Sherman Act for competitors to exchange price information on a regular basis (*United States* v. *Container Corp.* (1969) 393 U.S. 333, 336-337 [21 L.Ed.2d 526, 529-530, 89 S.Ct. 510]), producers may readily determine the prices charged by their competitors by referring to the prices filed with the department or to industry publications listing the posted prices. (Cal. Admin. Code, tit. 4, § 99.2, subd. (b)(2).)

In our view, the price maintenance provisions embodied in section 24755 clearly violate the policy underlying the Sherman Act.

On the other side of the balance, the price maintenance provisions are designed, as we have seen, to promote temperance and orderly marketing conditions. The promotion of orderly marketing conditions, i.e., preventing bargain sales, price cutting and similar selling practices on the retail level, has two aspects—to reduce excessive consumption, thereby encouraging temperance, and to protect small licensees from predatory pricing policies of large retailers.

The board rejected the argument that fair trade laws were necessary to the economic survival of small retailers, relying upon studies described in the report of the Senate Judiciary Committee which recommended repeal of the Miller-Tydings Act and the McGuire Act. These studies revealed that the absence of fair trade laws had not injured small retailers: states with fair trade laws had a 55 percent higher rate of firm failures than free trade states, and the rate of growth of small retail stores in free trade states between 1956 and 1972 was 32 percent higher than in states with fair trade laws.[21] (1975 U.S. Code Cong. & Admin. News, *op. cit.*, p. 1571.)

---

[21]The report declares in part, "No evidence was presented to indicate that there were destructive predatory practices in states which had repealed fair trade laws. Nor were there bad effects in Canada which repealed its fair trade laws in 1957 or in Great Britain which repealed such laws in 1965. A study published in 1969 reports small retailers were not driven out of business and predatory price cutting was rare in the four years following repeal in Great Britain. Similar experiences have been reported in Canada.

"Moreover, statistics gathered by the Library of Congress indicate that the absence of fair trade has not harmed small business. Using Dun and Bradstreet data, the Library of Congress found the 1972 firm failure rate in 'fair trade' states which have the nonsigner provision was 35.9 failures per 10,000 firms, in 'fair trade' states without the nonsigner provision the rate was 32.2 failures per 10,000 firms, while the failure rate in free trade States averaged 23.3 failures per 10,000 firms—in other words, 'fair trade' States with fully effective laws have a 55 percent higher rate of firm failures than free trade States.

"Finally, the traditional argument that fair trade protects the 'mom and pop' store from unfair competition is not borne out by the statistics. Between 1956 and 1972 the rate of growth of small retail stores in free trade states (including states which repealed 'fair trade' during this period) is 32 percent higher than the rate in 'fair trade' states."

Amicus curiae asserts that because package liquor stores and small grocery stores rely upon liquor sales for their economic existence, any tampering with the fair trade laws will have drastic consequences,[22] that New York experienced severe economic dislocation in the liquor industry after it repealed its fair trade laws,[23] that monopoly at the retail level will be increased without fair trade,[24] and that consumers will ultimately suffer because they will have a smaller number of liquor brands to select.

These arguments are aimed largely at protecting the economic interests of small retailers. They were considered and rejected by Congress when it determined in the Consumer Goods Pricing Act of 1975 to prohibit the states from enacting fair trade laws. While it is true that the liquor industry is heavily regulated and, therefore, competition in the industry may be inhibited to a greater extent than in other enterprises, this factor does not justify the continuation of fair trade laws which eliminate price competition among retailers.

The second and the major declared purpose for retail price maintenance of liquor is to promote temperance. The board determined that these provisions do not promote temperance, relying upon a report of the Moreland Commission in New York, cited in *Seagram & Sons, Inc.* v. *Hostetter, supra,* 384 U.S. 35, 39 [16 L.Ed.2d 336, 340]. According to that report, "compulsory resale price maintenance had had 'no significant effect upon the consumption of alcoholic beverages, upon temperance or upon the incidence of social problems related to alcohol.' "

A 1974 study referred to above found that per capita consumption of distilled spirits in California had increased by 42 percent between 1950 and 1972, and it concluded that "There is little compelling evidence to suggest that . . . fair trade . . . promote[s] temperance or contribute[s] in any significant way to the minimization of the current problem of alcohol

[22]Amicus relies upon a 1974 report of the Department of Finance, entitled Alcohol and the State: A Reappraisal of California's Alcohol Control Policies. This report, while critical of fair trade laws, states that economic dislocation would result from abrupt changes in those laws, and recommends a gradual 10-year modification, with termination occurring only after the economic consequences are examined.

[23]In this connection, amicus cites a 1971 report of the New York Senate Excise Committee which found price cutting, lack of normal competition, and other evils in the liquor industry after repeal of the fair trade laws.

[24]It is asserted that the larger chain operations would sell at or below cost on a short term basis, thereby driving small independent retailers out of business, and once small retailers had been eliminated, a monopoly would exist and prices would stabilize as high as the market could bear. This overlooks the prohibition against loss leader sales contained in Business and Professions Code section 17044, and other proscriptions against unfair business practices.

abuse." (Alcohol and the State: A Reappraisal of California's Alcohol Control Policies, *op. cit.,* pp. xi, 15.) Other authorities reach similar conclusions. (See, e.g., Sen. Select Com. Rep. on Laws Relating to Alcoholic Beverages, *op. cit.,* vol. 3, p. 69; Dunsford, *State Monopoly and Price-Fixing in Retail Liquor Distribution,* 1962 Wis.L.Rev. 454, 483.)[25]

Thus, while we concluded in *Allied Properties* and *Wilke & Holzheizer* on the basis of presumptions regarding the validity of the Legislature's exercise of the police power that we could not hold the connection between retail price maintenance and temperance was unquestionably "arbitrary and beyond rational doubt erroneous" the studies referred to above at the very least raise a doubt regarding the justification for such laws on the ground that they promote temperance.

Another factor in the balancing process is that fair trade laws generally are now contrary to public policy. This is demonstrated by Congress' reinstatement of the Sherman Act prohibitions, by the repeal in California of fair trade laws for products other than liquor (Stats. 1975, ch. 402, p. 878), as well as the recent modification of price maintenance provisions relating to the sale of milk (Stats. 1977, ch. 1192, [No. 5 Deering's Adv. Legis. Service] p. 118). Indeed, Corsetti points out that only two states, Massachusetts and Connecticut, currently retain mandatory retail price posting relating to liquor. Every state would appear to have an interest in the temperance of its inhabitants; the implication is clear, therefore, that resale price maintenance has not been found to be critical to achieve this goal in the vast majority of jurisdictions.

Finally, we find persuasive the argument that there are other means to achieve the fundamental goals of the price maintenance laws without running afoul of the Sherman Act. Thus, our laws prohibit the sale of any product as a "loss leader" (Bus. & Prof. Code, § 17044) and licensees may not offer any gift or premium in connection with the sale of alcohol (§ 25600). Other suggestions to carry out the policy of promoting temperance and orderly marketing conditions have been advanced. (See, e.g., Alcohol and the State: A Reappraisal of California's Alcohol Control Policies, *op. cit.,* p. 15.)

---

[25]A witness before the Senate committee stated that when New Mexico repealed its liquor fair trade law, consumption at first rose slightly, and then declined to a point lower than it had been while fair trade laws were in effect.

Dunsford states, "What evidence is available on the experience since 1934 casts doubt on whether the monopoly or price-fixing systems of control have any substantial temperance advantage in dealing with the unquestioned social risks of intoxicating liquors." (1962 Wis.L.Rev. at p. 483.)

█ In sum, we find that the policies underlying the Sherman Act are clearly violated by the liquor price maintenance laws, and that on the other side of the balance there is doubt whether such laws promote temperance, there is a clear national trend against fair trade laws, and there exist means other than mandatory price fixing to achieve the ends which those laws seek to attain. We conclude, therefore, that the policies underlying the Sherman Act must prevail, and that the price maintenance provisions embodied in section 24755 are invalid.

In view of this conclusion, we need not decide whether, as the board determined, section 24755 also violates equal protection of the laws.

## VI

The order of the board in Rice v. Alcoholic Beverage Control Appeals Board is affirmed. The writ of review filed by Young's Market is discharged and that petition is dismissed.

Tobriner, Acting C. J., Clark, J., Richardson, J., Newman, J., Taylor, J.,* and Racanelli, J.,* concurred.

Petitioner's application for a rehearing in No. 23631 was denied June 29, 1978. Bird, C. J., and Manuel, J., did not participate therein.

---

*Assigned by the Chairperson of the Judicial Council.