William H. WALKER, III, Commissioner, Department of Agriculture, State of Tennessee, Plaintiff-Appellant,

v.

BRUNO'S, INC., et al., Defendants-Appellees.

Supreme Court of Tennessee, at Knoxville.

April 25, 1983.

William J. Haynes, Deputy Atty. Gen., Barry Turner, Asst. Atty. Gen., Nashville, for plaintiff-appellant; William M. Leech, Jr., Atty. Gen., Nashville, of counsel.

Thomas A. Harris and David F. Hensley, Chattanooga, for Bruno's, Inc. and Consumer Warehouse Foods, Inc.

W. Ferber Tracy, Chattanooga, for Kroger Co., Inc.

William T. Alt, Chattanooga, for Golden Gallon, Inc.

Carlos C. Smith, Chattanooga, for Red Food Stores, Inc.

## OPINION

HARBISON, Justice.

These consolidated cases involve enforcement proceedings under the state "Unfair Milk Sales Act," T.C.A. §§ 52–331 to –334. An evidentiary hearing was held upon application of the Tennessee Department of Agriculture for a preliminary injunction. The injunction was denied. The parties thereafter submitted the record of that hearing along with supplemental materials for disposition of a motion for summary judgment filed by appellees who attacked the constitutionality of the regulatory statutes. The Chancellor held that the Unfair Milk Sales Act conflicted with the Sherman Antitrust Act, 15 U.S.C. § 1 et seq., and accordingly violated the supremacy clause in Article VI of the United States Constitution. We respectfully disagree and remand for further proceedings.

### A. The Present Proceedings

The Unfair Milk Sales Act, as hereinafter discussed, is not a resale price maintenance or "fair trade" statute but is designed to prevent "loss-leader" sales and other unfair sales practices. Among other things it prohibits retailers of milk from selling below a "lawful minimum price", subject to certain exceptions as hereinafter discussed.

The record reveals that an unstable milk pricing situation had prevailed in the Chattanooga marketing area since 1976. In 1978 an enforcement proceeding was begun by the Commissioner of Agriculture against several of the retailers involved in this case. They voluntarily agreed to comply with the statute and to cease selling milk below cost. Thereafter in 1978 the Commissioner suspected further violations and caused a conference to be held with several of the principal retailers, including the four parties defendant to one of the present consolidated actions. Subpoenaes were issued for several of the retailers. Again voluntary compliance was agreed upon. However, when further violations appeared to have occurred in 1979, the present proceedings were instituted.

### B. The Regulatory Statutes

The present milk-pricing statutes were adopted in 1961, replacing earlier statutes enacted in 1955 and in 1957. According to the legislative debates, the earlier statutes were designed primarily to prevent "surplus milk states" from "dumping" their excess milk in Tennessee "in huge quantities," thereby creating a "big monopoly," contrary to the interests of small milk plants and farmers within the state. A Senate sponsor of the 1955 statute stated that such "dumping" was engaged in to obtain a quick profit and to eliminate small companies.

The "Unfair Milk Sales Act" now under consideration replaced the earlier statutes. A House sponsor described it as a bill "to police against monopoly" among large processors and to prevent "subtle forms of price-fixing" among them to the ultimate detriment of the consumer. The Act was intended to prevent a conspiracy to sell

milk below cost on a sustained basis. If it violates federal antitrust measures, this most certainly was not the intent of its sponsors, according to its legislative history. As stated, the statute is not a "fair trade" or resale price maintenance statute in any sense. Tennessee had such a statute, but it has long since been repealed.[1]

Milk wholesalers and distributors subject to the Act are required regularly to file price lists both at wholesale and retail of all items of milk and dairy products sold by them and of all changes in and amendments thereto, these filings to be mailed to the Department at least ten days prior to the effective date thereof. The statute provides:

"Said price list shall be certified as correct by a duly authorized officer if that of a corporation or association or by the owner, a partner or duly authorized manager if that of an enterprise other than a corporation or association." T.C.A. § 52–331(2)(c).

Retailers are prohibited from selling milk below their cost. This cost is defined as the sum of the invoiced cost to the retailer, as shown on the schedules provided by wholesalers and producers, plus eight percent (8%), representing their presumed cost of doing business in the absence of proof to the contrary.

Presumably the Commissioner and his staff are entitled to rely upon the sworn or certified price lists furnished by the processors and distributors, unless they have other information indicating that these are not correct. It is clear from the testimony of Mr. Kelsey Jones, staff attorney for the Department, that the Department does not accept the filed price lists as conclusive or binding.

Further, the record is clear that the statute does not, either in theory or in practice, permit processors or wholesalers to "fix" or to establish the minimum retail prices charged by any retail grocer. A presumed cost of doing business of eight percent is added to the wholesale cost filed by the processors with the Department, but no retailer is required to sell at that figure if he can establish that his actual costs are less than eight percent. The retailer, not the wholesaler, has control of that aspect of the pricing.

Further, under T.C.A. § 52–334(7), any milk product may be sold by a retailer below the price fixed by the Department if such sale

"... is made in good faith to meet competition, provided that such prices shall not be cut more than once, nor in any event cut below the price of competition."

The statutes prohibit a number of advertising and sales practices by processors, distributors, and retailers of milk, an essential agricultural commodity. T.C.A. § 52–332. The following section, T.C.A. § 52–333, contains statutory authorization for the imposition of sanctions, both civil and criminal, against persons who may violate the Act. These statutes have been implemented by rather detailed regulations issued by the Department of Agriculture. See Tennessee Rules and Regulations, Section 0080–3–5–.01 to –.03. A number of exemptions from the regulatory statutes are provided. See T.C.A. § 52–334.

### C. Decisions Under the Sherman Act

In *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court of the United States held that state regulatory statutes may limit competition without conflicting with federal antitrust statutes. That case involved a challenge to a California intra-state raisin market program, and the Court enunciated a "state action" doctrine of antitrust immunity. In holding that the California statute did not violate the Sherman Act, the Court noted that federal legislation should never be interpreted as superseding a state's exercise of its sovereign police powers unless the purpose of Congress to do so is clearly manifested. The Sherman Act was found not to manifest any such purpose. The California raisin program was upheld as a proper exercise of the state's police powers for the benefit and protection of the public welfare.

---

1. *See* T.C.A. §§ 69–201 to –205 (repealed).

*Parker* and subsequent decisions established two standards for antitrust immunity for state regulatory schemes. First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy"; second, the policy must be "actively supervised" by the state itself. *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978). *See also California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). As hereinafter discussed, we find that the Tennessee statutes and regulations here under consideration meet both of these criteria.

The cases principally cited and relied upon by appellees and by the Chancellor below involved a California resale price maintenance or "fair trade" statute, which was wholly different in theory and in practice from the statutes here under consideration. That statute indeed permitted the processor of wine to set the retail price, and variations from that price could only be granted "for good cause" by the administrative agency charged with enforcement. In holding the statute violative of the Sherman Act, the California Supreme Court said:

"We have not been referred to any instance in which the department allowed a retailer to sell below the listed price 'for good cause.'" *Rice v. Alcoholic Beverage Control Appeals Board,* 21 Cal.3d 431, 146 Cal.Rptr. 585, 579 P.2d 476, 483 (Cal. 1978).

The entire statutory scheme in California was quite different from the Tennessee statutes involved here. That scheme was also held to violate the Sherman Act by the Supreme Court of the United States in *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).

In that case, the Supreme Court suggested that the level of state involvement which would have justified immunity from the Sherman Act would have included establishment of prices, review of the reasonableness of prices, or regulation and pointed re-examination of the program.[2] Each of these levels of involvement is present in the operation of the Unfair Milk Sales Act, as hereinafter discussed, thus meeting the second standard required to protect "anticompetitive activity" from antitrust challenge.

In another case relied upon by appellees, *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), the Supreme Court found violative of the Sherman Act the passive approval of a utility tariff by a Michigan administrative agency. In the course of its opinion, however, the Supreme Court said:

"Unquestionably there are examples of economic regulation in which the very purpose of the government control is to avoid the consequences of unrestrained competition. Agricultural marketing programs, such as that involved in *Parker,* were of that character." 428 U.S. at 595, 96 S.Ct. at 3120.

### D. *Analysis of the Tennessee Statute and the Present Record*

In our opinion the Tennessee regulatory statute involved here meets both of the standards or criteria set by the United States Supreme Court to prevent its conflicting with the Sherman Act.

The Chancellor recognized that the statute clearly articulated and affirmatively expressed a valid state policy, but was of the opinion that that policy was not sufficiently supervised by the state itself. In their briefs in this Court counsel for appellees appear to have conceded that the Tennessee statute is constitutional upon its face, but they attack the validity of its enforcement by the Department of Agriculture, at least during the period of time covered by this record.

---

**2.** Note, California Retail Liquor Dealers Ass'n v. Midcal Aluminum Co., Inc. *Limitation on State Action Antitrust Exemption,* 6 J. Corporation L. 681, 690 (1981). *See also, The State Action Exemption in Antitrust From* Parker v. Brown *to* Cantor v. Detroit Edison, 1977 Duke L.J. 871 (1977).

The Chancellor found that the statute permits milk wholesalers to set retail prices and that the State "cannot vary the privately established minimum prices even if it determines that the prices are contrary to the purpose of the Act."

In our opinion this statement is not borne out by the record or by the provisions of the statute. In sustaining the statute against a due process challenge this Court said:

"The Legislature gave the Commissioner broad and general power in order that he could bear the burden of enforcing the Act at the instance of injured parties or on his own volition, in accordance with the duties and responsibilities imposed upon him by the Act." *Hogue v. Kroger Co.*, 213 Tenn. 365, 377, 373 S.W.2d 714, 719 (1963).

The provisions of the statute and of the regulations promulgated thereunder make this abundantly clear.

We have previously alluded to the requirement that milk processors and distributors file certified lists of their wholesale prices and, if they sell at retail, of their retail prices. T.C.A. § 52–333 is replete with statutory authorization for the imposition of sanctions, both criminal and civil, against any person who may violate the Act, whether this be a processor, distributor or a retailer. The statute spells out in great detail actions which may be taken by the Commissioner, including the swearing out of criminal warrants, civil injunctions, complaints to the District Attorney, or the holding of administrative hearings. Among other sanctions which may be imposed by the Commissioner are revocation of plant licenses and registration privileges of violators.

The Commissioner initially approves or establishes minimum lawful prices. He has issued detailed regulations which confirm a policy of active enforcement and supervision. All distributors and retailers of milk and milk products covered by the Act are required to retain invoices for a period of ninety days, subject to inspection by the Commissioner or his duly authorized representative. They are required to keep bills of sale, purchase contracts and lease arrangements of equipment used for storing, transporting or selling milk products. Cost records of their operations during the preceding three months are to be maintained. These include invoices, cost of materials, salaries, rebates or discounts, lease agreements, purchase contracts, depreciation and tax computations.

The regulations require separate filings for sales in private label cartons, and lists of customers involved in sales on a store door or a store platform service or plant dock. Any amendment in price schedules must be filed with the Commissioner, including those made for the purpose of meeting competitive prices or lawful competitive conditions. Records concerning changes to meet competition are required to be preserved for a period of one year, together with information and statements detailing the surrounding circumstances. *See* Tennessee Rules and Regulations, §§ 0080–3–5–.01 to –.03.

It is difficult to conceive that this panoply of civil and criminal sanctions and regulations is not sufficient to "vary" prices which the Commissioner determines to be fixed contrary to the purposes of the regulatory statutes.

There is testimony from an inspector of the Department, Mr. Ansel Harper, to the effect that he simply administers prices fixed by two particular distributors. The Chancellor seized upon this testimony, but we believe that it must be taken in context. It had reference to the Chattanooga situation being considered in this litigation and is testimony from a mere retail inspector, not an official of the Department. Mr. Harper was a retail price inspector whose duties involved checking retail markups and wholesale invoices against filings which he had received from the Commissioner's office. He specifically testified that it was not his responsibility or a part of his employment to determine whether a violation of the statute had or had not occurred. Decisions as to whether a violation was occurring, decisions setting the lawful minimum prices and decisions as to whether to

take corrective actions were not made by Harper, but were made by other state officials.

Mr. Harper testified that he did not undertake independent investigations as to whether retail prices were reasonable or justified. He simply stated that if they did not represent eight percent above invoiced cost, he would correspond with Mr. Jones, staff attorney of the Department, and Mr. Jones would make a determination as to what should be done.

At another point in his lengthy testimony Mr. Harper was asked:

"Q. Mr. Harper, is it part of your purpose to see that everybody sells the same kind of milk at the same price?

"A. No. No.

"Q. Well isn't that the practical effect of what you do?

"A. No.

"Q. Don't you try to make that the effect of what you do, Mr. Harper?

"A. No."

It is perfectly clear from the testimony of this witness, taken in context, that he was nothing more than an inspector, and that if he found in the course of checking retail prices against invoices a situation which he felt to be suspicious or contrary to the statutes, he would report this to his superiors for appropriate investigation and action.

■ The Chancellor stated in his opinion: "No evidence was offered to establish that the Department of Agriculture has ever made any investigation of any of the prices filed by wholesalers during the 25 years the Act has been in effect."

In our opinion this finding is clearly erroneous. Both Mr. Harper and Mr. Jones testified that as to two of the parties defendant, Kroger and Golden Gallon, sufficient cost figures had not been supplied to the Department of Agriculture. Adequate cost figures had been supplied by the other wholesale suppliers, Flav-O-Rich and Mayfield. The Commissioner found nothing suspicious or unreliable about the latter cost figures, but, being dissatisfied with those supplied by the other two processors, he

was causing an investigation to be made into their cost figures and had been contemplating the issuance of administrative subpoenas for that purpose. Both Golden Gallon and Kroger were milk processors and retailers. They therefore had no regular wholesale cost figures to supply to the Department, and the Department had to rely upon their cost for raw milk, transportation costs, cost of containers and the like in order to compile a wholesale cost figure to then be marked up by the statutory eight percent in order to fix a minimum retail price for milk sold by these two processor-retailers. The record shows that the Department was actively supervising the cost figures of these two companies, making inquiries about them and was actively engaged in seeing that the policies embraced in the statute were being carried out—that is, that there be no deceptive trade practices or sustained sales below cost in order to divert trade or to engage in any of the other practices prohibited by T.C.A. § 52–332. The latter statute prohibits a number of practices both by processors and distributors and by retailers. It is by no means addressed solely to retail pricing.

■ We have already alluded to the fact that the statute does not permit processors or wholesalers to fix or establish a minimum retail price. No retailer is required to sell at the figure fixed by the Department if he can establish that his actual costs are less. Further, as previously pointed out, T.C.A. § 52–334(7) permits any milk product to be sold below the legal cost price fixed by the Department if it is made in good faith to meet competition.

The voluminous transcript in this case was compiled at a hearing dealing not with the constitutionality of the statutes in question, but with whether a preliminary or temporary injunction should be issued against the four defending retail grocery companies. The Chancellor found that all of them were selling below their cost and were violating the Act in that sense, but he found that they did not make such sales with intent to violate it and found that most of the sales were made for the purpose

of meeting competition under the exception quoted above. The Chancellor held in other proceedings that "milk is milk", regardless of brand name, and that any retailer could cut his price on any brand to meet a lawful retail price established by any competitor.[3] Under that holding of the Chancellor, no wholesaler or processor could possibly fix the price at which its product would be sold at retail, because the retailer might well sell below his projected "cost" (based upon the wholesale figure plus the statutory markup) if his actual costs were less than that computed under the statutory formula or if a retail sale was made in order to meet a lawful competitive price. As stated, therefore, the statute is not a price-fixing one in any sense. It is simply designed to prevent unfair and deceptive trade practices with respect to the advertising and sale of essential farm commodities, milk and milk products.

▮ The Chancellor correctly stated that the statute does not involve the Commissioner in determining what is or is not a desirable minimum milk price from the standpoint of the consuming public. That is not its purpose. Neither does he fix a maximum retail price. The statute is designed to prevent deceptive advertising and loss-leader sales by the continued advertising and sale of milk below the retailer's cost, that cost being his invoice price plus eight percent unless he shows otherwise by specific evidence. The Commissioner does in fact actively and continuously supervise this statutory program which was held by this Court in *Hogue v. Kroger Co., supra,* to be "a purpose affected with the public interest and quite properly within the State's police power." 213 Tenn. at 372, 373 S.W.2d at 717.

Continuing, the Court said:

"The method adopted by the Legislature to attain this end was to prohibit retailers from selling milk below their cost. This "cost" was defined as the sum of their invoiced price, plus eight per cent of their invoiced price for cost of doing business (the eight per cent being the presumed cost of doing business in absence of proof to the contrary).

"The Act is not for the purpose of guaranteeing to anyone a profit. It is not a price-fixing statute. Under it, the retailer may set any price he chooses so long as it is above his 'cost'. Its purpose, as set out above, would be defeated if retailers could avoid its limitations directly or indirectly so as to sell at prices effectively below 'cost'." 213 Tenn. at 372, 373 S.W.2d at 717.

It is clear from the testimony of both Mr. Harper and Mr. Jones that the Department does not exercise any control over the pricing of raw milk to the farmer. This is controlled by federal marketing orders, which are expressly recognized by the Tennessee statutes. T.C.A. § 52–331(1)(m). Mr. Jones testified, however, that his Department had definitely undertaken to ascertain actual costs both from Golden Gallon and from Kroger, since they did not file the wholesale price list required by the statute, for the reasons stated above. Mr. Jones testified that he had real reservations about using the eight percent markup figure as retailers' cost in connection with the products of both of these companies. He said that he had no way to ascertain the Kroger cost other than to use the procedures outlined by law, such as by investigation and subpoenas. Kroger apparently purchases its milk in the midwest and has it shipped into the Chattanooga area.

Describing the actual involvement of the Department of Agriculture in the administration of the present statute, Mr. Jones testified as follows:

"Q. What is your understanding of your involvement insofar as the government is concerned of setting the price of milk?

"A. I administer a law which regulates unfair trade practices in the sale of dairy products to the extent that particular methods of pricing are included as unfair trade practices.

---

**3.** Milk is classified and priced according to butterfat content. The Chancellor deemed 3.5 percent butterfat milk of one brand to be equivalent to that of another.

"Then, I feel that we have an impact on pricing.

"I don't feel that we set it at any point.

"Let me elaborate on that a little more.

"The particular sale—the most common unfair trade practice which comes to our attention is the sale below cost. And obviously there is a direct impact on price there, because if someone is selling a product at a price which is below their cost, well, then, we feel that it is a violation of the law and take action, some action to correct the problem."

Mr. Jones said that he ordinarily took action against a retailer which he felt was initiating price cuts below cost, and not against others who made cuts for the purpose of meeting competition. As stated, the transcript of testimony indicates that the four defending retailers in the present case for many months were selling below their cost as computed by the Commissioner from such data as he had. It may be that he was unwise in instituting an enforcement proceeding when he did not have at hand the actual cost of either Kroger or Golden Gallon, since the other defending parties insisted that they cut their prices to meet competition by sales of those competing products. Nevertheless the record indicates that the Department is kept currently aware of price trends in the milk industry, of rising or falling costs of raw milk, containers and other equipment, and that it at all times has current information as to what actual costs should ordinarily be.

Neither the statute by its terms nor the record in this case, in our opinion, demonstrates a passive submission by the State in letting wholesalers or milk processors set retail prices in a monopolistic or anti-competitive fashion as found by the Chancellor.

The record in this case dealt with one narrow marketing area of the state. It dealt with a market that had been unstable for a period of years because of a variety of factors shown in the record, including the proximity of competing markets in the neighboring state of Georgia. To conclude from this record that the entire statutory scheme puts the State in the position of fixing prices in a monopolistic fashion, in our opinion, is unjustified. As stated previously, the testimony which was adduced in this regard was taken before a constitutional issue had been formally raised, and was taken on a hearing for a temporary injunction prior to the filing of responsive pleadings by the defending parties. It is therefore not surprising that there is absent from the record a detailed history of the enforcement of the statute in other parts of the state or during other periods than the short time covered by this record.

The finding of the Chancellor that there had not been active supervision by the Department failed to take note of the fact that the Department was in fact investigating the prices filed by both Kroger and Golden Gallon when the present enforcement proceedings were begun. It further ignores the following testimony of Mr. Jones:

"Q. All right, sir. Now, as I understand from Mr. Harper's testimony, your Department does not undertake to go behind the price filings made by the wholesalers; is that correct? You accept their wholesale price filings at whatever figure they give you.

"A. Well, we generally do, Mr. Smith.

"That is not to say that we will always do that.

"If a price were filed that was inordinately low, it looked suspiciously low, arouse our suspicion, then that would probably be cause for us to try to proceed administratively to look behind that figure.

"But as a general rule, the prices that are filed are routinely in order—rarely—well, they have never to me given an indication—there is always an increase, I guess.

"Q. All right, sir. So, what you do, or what your department does when you get the price filing, you take the rebate, is that correct, which gives you a net price to the retailer?

"A. Yes. The rebate is part of the price filing.

"Q. All right, sir. And then you take this mathematical figure out of the statute, eight percent in the case of the retailers involved here, and then you take that percentage and add it to the net price to get their minimum retail price; is that correct?

"A. The law allows us to presume eight percent for their cost of doing business.

"We don't always allow them, but most of the time we do.

"Q. So, for all practical purposes, when you receive from Mayfield and Flav-o-Rich a price filing as to what their wholesale prices are, you effectively, except for doing two mathematical calculations, permit Mayfield and Flav-o-Rich to set the minimum price for their product; is that not correct?

"A. I will have to qualify the answer to that.

"Q. All right, sir.

"A. In the usual sense, that's probably true.

"That would be a Fair Trade Law, obviously, a resale price maintenance arrangement.

"The law is not that, and I believe the Court can come to that conclusion.

"But if there is a lower lawful price on the market, then they can go down to that price regardless of what their costs are.

"So, in that sense, the wholesaler would have no control over the eventual retail price of this commodity.

"Q. All right, sir. But when they do go below that cost, they are taking advantage of the provision in the code that they are selling below cost to meet competition?

A. True.

Q. All right, sir. But what I'm saying is that Mayfield and Flav-o-Rich, effectively, by filing with you a price, set the minimum price, the minimum cost of milk in this market; is that not right?

"A. I couldn't agree with that, either. I mean, effectively, no. Because we've got—Golden Gallon here, I'm not at this time prepared to challenge the $1.69, $1.49, $1.29. That may be, and in fact that could be, depending upon the whim of Golden Gallon, if they choose to establish their price there, then other merchants in the market could also go down to that apparently lawful price to meet it."

In further testimony, Mr. Jones stated that the Department did not require retailers to use the eight percent markup over wholesale invoice. He said:

"We don't require them to mark that up. We tell them what, based upon the presumption in the law, the lawful minimum price would be.

"I have always made it clear to them that if they can establish actual cost less than that presumption, that they are welcome to use some figure less than eight percent of the invoice.

"And I have also made it known to them that if there is a competitor in the market who is pricing less than what they are and less than what their wholesale cost is, and lawfully doing so, that they are entitled to meet him.

"Q. Let me get back to my question first.

"The effect of your application of the laws require retailers, if they follow your orders, to mark up wholesale milk by eight percent; is it not, sir? I'm talking about the practical effect now. Isn't that what they do?

"A. As a practical matter, the eight percent figure probably has some significance, true. But, again, eight percent, if it's standard service—I don't know—there may be some merchants in the market who are receiving drop shipment. I'm not sure.

"But in the sense that they are receiving standard service and where they do not care to offer evidence to the contrary, they do use the eight percent, and that's the minimum price over their wholesale invoice."

Mr. Jones testified positively that the practical effect of the administration of the statute by his Department was not to set a

uniform price throughout the market. He said:

"As I have stated to you earlier, there are other factors in the market. They have the right to meet competition which, as you know, in this market is something that is done very frequently.

"And they have the right to acquire milk from a different source.

"We are not requiring that they acquire their milk from these particular wholesalers; although, you say as a practical matter they do.

"But I couldn't agree that they set the price in the market, no."

Mr. Jones did testify that after his administrative hearing in 1978, retail grocers raised their price above cost and all of them ultimately arrived at the same price. This was action taken by the retailers, however, not by wholesalers or processors, and came after the Department had called a conference of retailers pursuant to pricing complaints which it had received.

■ It is clear from the testimony that the varying rebates which are given to large volume retailers cause presumed lawful statutory minimum prices of different retailers to vary. Since any other retailer can set his retail price to meet any lawful price, the effect of the statute is not to set a uniform price in the market in any sense, but simply to prevent deceptive advertising and sales practices. The Department monitors those practices which are actually followed by the retailers and monitors the price lists submitted by the wholesalers and processors. The role of the State in the administration of this statute is not passive in any sense, in our opinion, nor is the State fostering monopolistic practices, engaging in them itself, or permitting, expressly or impliedly, combinations in restraint of trade.

### E. Federal and State Interpretation of Similar Statutes

The involvement of the Commissioner of Agriculture, the state dairy administrator, and their staffs is markedly similar to the powers of the Connecticut Liquor Commis-

sion in *Serlin Wine & Spirit Merchants, Inc., v. Healy,* 512 F.Supp. 936 (D.Conn. 1981), and the Alcohol and Tobacco Tax Division of the Maryland State Comptroller's Office in *George W. Cochran Co. v. Comptroller of the Treasury, Alcohol and Tobacco Tax Division,* 292 Md. 3, 437 A.2d 194 (Md.1981). These cases, which dealt with statutory prohibitions against below-cost selling, upheld unfair sales acts which are similar in design and purpose to the Unfair Milk Sales Act against antitrust challenges. In each case the level of state supervision and enforcement was held to satisfy the second state action requirement for exemption from Sherman Act violation.

Indeed appellees have cited little authority for holding an unfair sales statute, such as that involved here, violative of federal anti-trust statutes. However, the Commissioner has cited and relies upon *Baseline Liquors v. Circle K Corp.,* 129 Ariz.App. 215, 630 P.2d 38 (1981), in which an Arizona appellate court expressly distinguished between resale price maintenance laws and those designed to prevent "loss-leader" sales or other unfair sales practices. Citing and distinguishing the *Rice* case, *supra,* from California, the Arizona court said:

"The Rice opinion dealt with a fair trade law in California. It found that the law violated the Sherman act and was not protected by the state action exemption to the law. That is not the situation here, since this statute is not a fair trade act, but one which prohibits below-cost sales for the purpose of injuring competition. That there is a difference is manifested by the fact that until 1976, Arizona had *both* a fair trade act *and* an act prohibiting below-cost sales. The former was repealed." 630 P.2d at 45.

The Arizona court also noted that the California court had not stricken down "loss-leader" statutes of that state and had indicated that those statutes would be sufficient to achieve fundamental goals of price maintenance laws without contravening the Sherman Act. Review of the Arizona decision was denied by the Supreme Court of the United States. *See Skaggs Drug Cen-*

*ter, Inc. v. Baseline Liquors,* 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 387 (1981).

In the recent case of *Rice v. Norman Williams Co.,* —— U.S. ——, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982), the Supreme Court of the United States sustained certain California liquor statutes against a Sherman Act attack. These statutes required that wholesalers be designated as authorized importers by distillers in order to purchase or accept delivery of the distillers' brands of beverages. While those statutes were quite different from the agricultural commodity regulations involved in the present case, the following statement from the opinion of the Court is instructive:

> "In determining whether the Sherman Act preempts a state statute, we apply principles similar to those which we employ in considering whether any state statute is preempted by a federal statute pursuant to the Supremacy Clause. As in the typical preemption case, the inquiry is whether there exists an irreconcilable conflict between the federal and state regulatory schemes. The existence of a hypothetical or potential conflict is insufficient to warrant the preemption of the state statute. A state regulatory scheme is not preempted by the federal antitrust laws simply because in a hypothetical situation a private party's compliance with the statute might cause him to violate the antitrust laws. A state statute is not preempted by the federal antitrust laws simply because the state scheme might have an anti-competitive effect. [Citations omitted.]

> "A party may successfully enjoin the enforcement of a state statute only if the statute on its face irreconcilably conflicts with federal antitrust policy." 102 S.Ct. at 3299.

### F. *Our Conclusions*

In our opinion the regulatory statutes involved in this case do not, in theory or in practice, violate any federal antitrust legislation. They fall well within the state police power as recognized by both state and federal decisions, deal with a vital farm commodity and are important in the regulation of the milk industry in this state.

After a lengthy hearing in this case, the Chancellor denied a temporary injunction because he did not find that the violations of the statute committed by the four defending parties were intentional, and he found that some of their below-cost prices were lawfully fixed in order to meet competition as permitted by the statute. No additional evidence was offered after answers were filed and motion for summary judgment heard. It may be that upon remand he will see fit to deny injunctive relief, but that is a far different thing from striking this statute from the books as conflicting with federal anti-trust legislation. It seems to us to do just the opposite—that is, to involve the State in preventing deceptive pricing, advertising, and sales practices and to prevent the use of milk and dairy products as loss-leaders in the wholesale and retail business. In this sense it resembles several other state statutes designed to prevent unfair trade practices.[4]

The judgment of the Chancellor is reversed and this cause is remanded for further proceedings which he may deem appropriate. Costs incident to the appeal are taxed to appellees. All other costs will be assessed by the Chancellor.

FONES, C.J., and COOPER and DROWOTA, JJ., concur.

BROCK, J., files dissenting opinion.

BROCK, Justice, dissenting.

I respectfully dissent from the majority opinion.

On or about May 1, 1979, Ansel Harper, who was employed by the Tennessee Department of Agriculture to monitor retail dairy prices in the Chattanooga/Hamilton

---

4. *E.g.,* T.C.A. §§ 52–335 to –341 (Unfair Frozen Dessert Law); T.C.A. §§ 69–301 to –306 (Unfair Sales Law); T.C.A. §§ 69–401 to –413 (Unfair Cigarette Sales Law); T.C.A. §§ 69–101 to –115 (Unlawful Restraint of Trade and Discrimination); T.C.A. §§ 69–601 to –607 (Unfair Trade Practice and Advertising Act).

County area, observed that Bruno's was selling milk at prices that violated Tennessee's "Unfair Milk Sales Act," T.C.A., §§ 52–331–52–334. Harper reported Bruno's prices to his superiors in the Department. Bruno's pricing of milk at prices below cost, as computed pursuant to T.C.A., § 52–331(1)(n), resulted in this enforcement action by the Commissioner.

The Chancellor held that the Act conflicted with the Sherman Antitrust Act, 15 U.S.C. § 1, and was, therefore, proscribed according to the dictates of the supremacy clause in Article VI of the federal constitution. The case reaches us by direct appeal.

The Unfair Milk Sales Act is an anticompetitive measure first adopted by the legislature in 1955. Ostensibly, the Act was designed to prevent destruction of the small retailer by financially strong competitors who are able to sell below their costs for extended periods of time. *Hogue v. Kroger Co.*, 213 Tenn. 365, 373 S.W.2d 714 (1963). To achieve that end the Act establishes a "lawful minimum price" and makes it unlawful for a retailer to sell milk below this statutory minimum. The method adopted by the legislature to attain this end was to prohibit retailers from selling milk below their cost. This "cost" is defined as the sum of (1) the retailer's invoiced price plus (2) their "cost of doing business" which is presumed to be 8% of the invoiced price, in the absence of proof to the contrary. Wholesalers and producers file price schedules with the Department of Agriculture and the 8% markup is applied to those schedules.

The Sherman Act was enacted in 1890 and declared: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states or with foreign nations is declared to be illegal." The Miller-Tydings Act and the McGuire Act were enacted by Congress in 1937 and 1952, respectively, for the purpose of permitting "fair trade" contracts and laws which prescribe minimum resale prices for certain goods, and allowing "non-signer" provisions which make minimum resale prices enforce-able against a retailer who has not entered into a "fair trade" contract. The Tennessee legislature enacted the Unfair Milk Sales Act in 1955.

In 1975, the U.S. Congress enacted the "Consumer Goods Pricing Act" which effectively repealed Miller-Tydings and McGuire. The result has been a restoration of the Sherman Act's ban on resale price maintenance unless the industry or program enjoys a special antitrust immunity.

In *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court acknowledged that a state may engage in anti-competitive conduct and not run afoul of the Sherman Act. The court's *ratio decidendi* is revealed in its conclusion that, "[t]here is no suggestion of a purpose to restrain state action in the [Sherman] Act's legislative history." 317 U.S. at 351, 63 S.Ct. at 313. This so-called "state action exemption" is limited, however, to those situations in which a state exercises its legislative authority in promulgating regulations and in prescribing the conditions of their application. In effect, *Parker* holds that the Sherman Act does not forbid the State itself to fix non-competitive prices, but that a state statute which purports to permit private parties to engage in non-competitive price fixing is in violation of the Sherman Act. The anticompetitive conduct, therefore, requires more than mere state approval before it is granted immunity. *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

Recently in *California Retail Liquor Dealers Asso. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Supreme Court once again addressed the issue of antitrust immunity, and articulated the following standards based on *Parker v. Brown* and its progeny:

"These decisions establish two standards for antitrust immunity under *Parker v. Brown*. First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively super-

vised' by the State itself. *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978)." 445 U.S. at 105, 100 S.Ct. at 943.

The Unfair Milk Sales Act, as interpreted in *Hogue v. Kroger Company, supra,* comports with the first standard set forth in *Midcal* requiring that state policy of noncompetition be clearly articulated. The second requirement, active supervision and promotion of that policy by designated state authorities, however, is not present in the Act; and, the evidence reveals that in practice the supervisory activity of the Department of Agriculture is so minimal as to disqualify the Act from the qualified antitrust immunity allowed to the states in *Parker v. Brown.*

The regulatory scheme challenged in *Parker* permitted the organization of local cooperatives to develop marketing policies for the California raisin crop. The program was administered under the auspices of the State Agricultural Prorate Advisory Commission. The Advisory Commission, which was appointed by the Governor, was empowered to disallow the implementation of any cooperative policies if those policies were deemed to be in derogation of the objectives of the program. Owing to the high degree of direct involvement and supervision by state authorities, the Supreme Court held in *Parker* that the Sherman Act did not apply. In *Midcal* the court was attempting to further define the parameters of the state action exemption, and referring to the *Parker* decision stated, "Without such (state) oversight, the result could have been different."

The testimony of an employee of the Tennessee Department of Agriculture, whose duties include checking the prices of milk at retail stores, reveals the extent to which the state is involved in administering the Unfair Milk Sales Act. The employee testified as follows:

"Q. I'm talking about the price filings that are made by your department from Mayfield and Flav-o-rich, as to what they are selling at wholesale;

you accept those at face value, do you not?

"A. That's right.

"Q. You don't go behind those numbers. So really, all you are doing is you are administering a statute, the minimum prices of which are fixed by Mayfield Dairies and Flav-o-rich, are you not?

"A. That's right."

The activity described above does not rise to the level of state involvement required to immunize anticompetitive conduct from the strictures of the Sherman Act. Indeed, it more closely resembles the wine pricing scheme that was condemned by the Supreme Court in *Midcal,* the court saying:

"The State simply authorizes price-setting and enforces the prices established by private parties. The State neither establishes nor reviews the reasonableness of the price schedules; nor does it regulate the terms of fair trade contracts. The State does not monitor market conditions or engage in any 'pointed reexamination' of the program. The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." 445 U.S. at 105–106, 100 S.Ct. at 943.

The learned Chancellor analyzed the Tennessee Unfair Milk Sales Act in the context of the affirmative responsibilities that state authorities must undertake to avoid application of the Sherman Act. In a thorough and well reasoned opinion he found as follows:

"Under the terms of the Tennessee Unfair Milk Sales Act, the state has no power to undertake investigations to determine what minimum price will best serve the public interest and best achieve the purposes of the Act. The state cannot vary the privately established minimum prices even if it determines that the prices are contrary to the purposes of the Act. In fact, the small retailer which the Act purports to protect is placed at a competitive disadvantage by volume dis-

counts afforded by wholesalers and producers to the large retailers."

This anomaly is the result of rebates included in the price schedules filed by wholesalers. The quoted testimony that follows is that of Mr. Kelsey Jones, staff attorney with the Tennessee Department of Agriculture and administrator of the "milk law," and it demonstrates the effect of these rebates. Mr. Jones testified as follows:

"Q. When you get these wholesale reports that are filed, they are required to be filed is that true, sir?

"A. That's correct.

"Q. And where they file these discounts, rebates, I think they call them— those rebates are based on volume; is that correct?

"A. Correct.

"Q. So, therefore, the larger the purchaser, the bigger the purchase, the larger the volume of purchase, the cheaper they got the milk; is that true.

"A. Yes.

"Q. And then, I think, as you answered to Mr. Harris, when it comes to the small Mom and Pop operation, they don't get the discount and therefore their cost is higher, is that correct?

"A. That's correct.

"Q. And I think you indicated their only alternative, other than to sell at what it costs them is to cut their price down to supermarket level; is that right?

"A. Cut their price down, correct.

"Q. And then, over an extended period of time, they are constantly losing money on the sale of their milk; is that correct?

"A. That's correct."

This testimony substantiates the Chancellor's conclusion that, "In fact, the small retailer which the Act purports to protect is placed at a competitive disadvantage by volume discounts afforded by wholesalers and producers to the large retailers."

The California appellate court based its ruling in *Midcal* on a prior decision by the California Supreme Court in which similar pricing restrictions were invalidated because of passive state involvement. That case was *Rice v. Alcoholic Beverage Control Appeals Bd.*, 21 Cal.3d 431, 146 Cal.Rptr. 585, 579 P.2d 476 (1978), wherein the court described a situation very similar to that in the case at bar.

"In the price maintenance program before us, the state plays no role whatever in setting the retail prices. The prices are established by the producers according to their own economic interests, without regard to any actual or potential anticompetitive effect; the state's role is restricted to enforcing the prices specified by the producers." 579 P.2d at 486.

The point was made in *Rice* that the vertical control exerted over wine prices by producers resulted in effectively destroying horizontal competition. I conclude, after reviewing the record evidence, that the Tennessee Unfair Milk Sales Act has the same effect in this regard. Mr. Kelsey Jones, an attorney with the Tennessee Department of Agriculture, whose testimony was quoted *supra*, further testified as follows:

"Q. All right, sir. When you contacted the defendants who have been named in this suit after the administrative hearing and told them what you thought the legal price of milk was, did they all establish the same price after your contact, sir?

"A. They all established a price above those lawful, what I considered to be the lawful minimum prices.

"Q. That is the same price for like items?

"A. I believe that they did arrive at the same prices."

It is obvious on the face of the record that horizontal competition is substantially impeded by enforcement of the Unfair Milk Sales Act and, since the Sherman Act forbids the kind of price fixing shown here, the Tennessee enactment should yield under the supremacy clause of the Constitution of the United States.

I would affirm the decree of the Chancellor.