Bergan, J.
In 1963 in response to malfunctions in the administration of the State’s liquor law and public dissatisfaction with controls on the sale of alcoholic beverages, the Governor appointed a Moreland Commission directed to make a “ study and reappraisal ” of the law.
In appointing the commission the Governor noted that since the enactment of the Alcoholic Beverage Control Law in 1934, soon after the end of prohibition, there had been “ no major reappraisal or revision of the law in the light of experience and current social problems and economic conditions ”.
The commission addressed itself, among other things, to the price of liquor in New York and the effect of price on temperance in the use of liquor. One of the basic assumptions of the statute then in effect was that, if the price of liquor were cheap, its consumption would increase and the policy effected by the statute was to sustain the price.
Former section 101-c of the Alcoholic Beverage Control Law had authorized a manufacturer who was a “ brand ” owner to fix the minimnm retail prices for that brand, for the violation of which the retailer was subject to discipline by the State Liquor Authority (subd. 7). The statute (§ 101-b, subd. 3) had for over 20 years also provided for filing price schedules by brand owners and wholesalers.
*54 The commission’s studies led it to believe that the assumed favorable relation of high-priced liquor to temperance was chimerical. The prices of liquor in New York were high, but consumption had steadily risen and this did not indicate high prices increased temperance. It found “ a greater than average ” increase in per capita consumption in New York (Moreland Comm. Report No. 1, p. 3).
The principal benefit from the minimum price requirement for liquor in New York went to the liquor interests. This served ‘ ‘ merely ’ ’, said the commission, ‘ ‘ to insure profit margins of the various segments of the industry” (Report No. 3, p. 19, offered as Exhibit E by plaintiffs at Special Term) and ‘‘ The argument that high prices promote temperance in that they keep liquor out of the hands of those who should not have it ” is “ unfounded ” (id., p. 17).
Its studies showed no correlation between consumption and prices, looking at the experience in States in which prices were high compared with those in which they were low.
It found in effect gross price discrimination against the New York consumer by the industry. It developed that the retail price for a fifth of a well-known brand of liquor was lower in Washington, D. C., than the wholesale price in New York. One brand, for example, cost $2.85 retail in Washington and $3.45 wholesale in New York, another $3.39 and $4.15 respectively (see Report No. 3, pp. 5, 6).
This report adds: “ For almost every fifth of whiskey that he buys, the New York consumer pays 50 cents to $1.50 more than the price at which it is available in at least seven freer price markets ” (p. 3).
On the basis of these reports the Governor, made recommendations to the Legislature (Message, Feb. 10, 1964). He observed that the administration of the State’s liquor law had been marked by “ periodic instances of corruption and favoritism ”. He noted the favored position of the liquor industry in an area which was the subject of public regulation and that the Moreland Commission had reported ‘1 it is contrary to the public interest to have the regulated industry in such a dominant role ”. He added that the commission had sought means of ‘1 Bringing justice to the consumer by putting to an end the artificial devices *55 whereby the liquor industry has received uniquely beneficial treatment at the consumer’s expense.”
The Governor also noted that as a result of the distiller-fixed consumer prices under the statute a “surcharge” had been “ foisted on New Yorkers ” of $150 million a year over what would have been paid in a free market.
The result of the commission study and the Governor’s recommendations was the enactment of a statute by the Legislature (L. 1964, ch. 531) which, among other things, vitally changed the direction of liquor price policy in New York and sought to reduce consumer prices.
This suit is maintained by 62 distillers and wholesalers of alcoholic beverages and some importers against the State Liquor Authority and the Attorney-General to declare the provisions of the 1964 statute invalid. The main attack is directed to section 9 of the statute; the other is directed to certain parts of section 7. The court at Special Term in a comprehensive opinion granted judgment for defendants; the Appellate Division affirmed.
In changing the direction of its policy which had been to prevent prices from going too low by establishing effective devices pursuant to which the liquor industry could in effect fix minimum retail prices on brand liquors, the Legislature by section 9 of the 1964 statute set up means which sought to keep down the prices of brand liquors to the consumer. The mechanism is a simple one and it lies technically in the control of the liquor industry. But it is a mechanism to which plaintiffs take vigorous exception on a diversified number of grounds.
The provision is this: On filing the schedules of brand owners ’ prices to wholesalers, which for 20 years had to be filed monthly under the former provisions of section 101-b, the brand owner or his designee must file an affirmation “ that the bottle and case price” to wholesalers in New York “is no higher than the lowest price at which such item of liquor ” was sold the previous month to any wholesaler elsewhere in the country or any State or State agency operating a public liquor enterprise (§ 9).
■ Thus it was sought to end the discrimination by the liquor industry against the New York consumer which, as the commission had found, cost the New York consumer $150 million a year above that which a free market would have offered.
*56 This change from a favored and protected profit position to a possibly sparse profit situation may make it economically difficult for the liquor industry. If it does it is within the competence of the New York Legislature to make it that way. Even without article XXI of the Amendments to the United States Constitution, New York could end the liquor traffic within its borders entirely. The State of Mississippi, for example, prevents the plaintiffs or anyone else from selling liquor there and no one doubts its power to do so. But the Twenty-first Amendment spells out an additional specific and federally protected right of each State to eliminate as well as regulate the liquor traffic within its borders (Mahoney v. Triner Corp., 304 U. S. 401).
A long history of regulation, control, price fixing, place of time and sale setting, and outright extinction lies behind the liquor business in this country since Colonial times, and it is too late today to suggest that the rights of those who choose to engage in it are on a constitutional or legal parity with the rights of people who trade in bicycles, or cosmetics, or furniture.
If the conditions set down by the Legislature are economically impossible for the liquor industry to meet, it will have to accept this impossibility. But we are of opinion they are not economically impossible and that the effect of the 1964 statute will be to reduce liquor profits and pass the benefit of some of them on to New York consumers.
In effect the dependence of the New York price on the maximum price of the distiller for his brand elsewhere is to tie the price in this State in to a national price. There is nothing unreasonable about that. It is not an interference with interstate commerce. The effect is on what the distiller charges here and is an effect closely associated with the sale and distribution of liquor within the State.
That it reflects and depends on events outside the State does not condemn it. It could as well have been tied into the national average price of liquor or the national cost of living index. It is a device to end a demonstrated discrimination against the New York consumer and it is a device within the power of the State to employ in this regulated activity.
There is in the record proof offered at Special Term by plaintiffs in an exhibit (Exhibit C attached to the affidavit of Thomas *57 F. Daly) consisting of excerpts of the testimony before a legislative committee of Judge Lawrence E. Walsh, the Moreland Commissioner, who personally opposed the kind of regulation prescribed by section 9, in which the statement is made that in the liquor industry ‘ ‘ the whole sum total of that relationship averages out to a price that is average across the country ”.
He cited Pennsylvania, a monopoly State, “ the largest purchaser of liquor in the world * * * $400,000,000 worth of liquor a year—one customer ” as being an example of a customer who insists “ on the lowest price that the distiller offers anywhere in the country
In the light of this kind of national marketing situation, the actual difficulty of the distiller in seeing to it that the New York buyer pays no more than “ the lowest price ” elsewhere seems greatly overstressed.
Under section 9 the distillers themselves control the base price since they fix the lowest price elsewhere. If its effect on New York is too low a price they have it within their power to raise the lowest price elsewhere. The industry must absorb any differential cost in doing business as one of the incidents to a highly regulated industry. The incidental effect of this on prices in another State does not invalidate the New York statute.
The requirement of section 9 is not, indeed, unusual in concept and those States which have State liquor monopolies, we are told, require the distillers to warrant that the price charged the State monopoly for brand liquors is no higher than the price charged in other States. Thus we think the price regulation in the 1964 statute is neither impossible of compliance nor unreasonable.
It is thoroughly settled that when it comes to the regulation of liquor traffic a wide area of public power may be exercised in plenary fashion by State governments without Federal interference either under the commerce clause or under the equal protection provisions of the Constitution.
A leading decision is State Bd. v. Young’s Market Co. (299 U. S. 59) where the court in an opinion by Mr. Justice Brandéis sustained a State statute imposing a license fee for the privilege of importing beer from other States against the argument that it violated both the commerce clause and the equal protection clause.
*58 In the same direction is Mahoney v. Triner Corp. (304 U. S. 401, supra); again in an opinion by Justice Brandéis the court sustained a Minnesota statute imposing additional processing conditions on liquor coming from other States, a statute which the court noted “ clearly discriminates in favor of liquor processed within the State against liquor completely processed elsewhere ” (p. 403).
Similarly discriminating statutes in Michigan which prohibited dealers in beer there from selling beer manufactured in other States which in turn discriminated against beer manufactured in Michigan (Brewing Co. v. Liquor Comm., 305 U. S. 391) and to the same effect in Missouri (Finch & Co. v. McKittrick, 305 U. S. 395) were each sustained. The statute before us could scarcely be deemed to have as much impact on the plaintiffs’ Federal rights as these.
In Ziffrin, Inc. v. Reeves (308 U. S. 132, 138) a Kentucky statute confining the transportation of liquor to licensed common carriers was sustained, with Mr. Justice McRbynolds propounding the question: ‘ ‘ Having power absolutely to prohibit manufacture, sale, transportation, or possession of intoxicants, was it permissible for Kentucky to permit these things only under definitely prescribed conditions?” And making the answer: “Former opinions here make affirmative answer imperative.”
As the Appellate Division opinion noted, nothing in the later decisions of the court upon which appellants mainly rely suggests that the basic power of New York to control the liquor traffic has been impaired. The holding of United States v. Frankfort Distilleries (324 U. S. 293) is merely that liquor producers, wholesalers and retailers may not conspire unlawfully to fix prices in violation of the Sherman Anti-Trust Act (U. S. Code, tit. 15, § 1 et seq.) Nothing in that decision sustains any part of plaintiffs’ contention.
And Hostetter v. Idlewild Liq. Corp. (377 U. S. 324) and Department of Revenue v. James Beam Co. (377 U. S. 341) are irrelevant to the case before us. The principles announced in the earlier cases were re-enforced in 1958 in the denial of the application of California to file a bill of complaint against Washington (California v. Washington, 358 U. S. 64).
*59 On the general exercise of State powers in matters affecting the welfare of a State and its people, liquor aside, see Hoopeston Co. v. Cullen (318 U. S. 313); Huron Cement Co. v. Detroit (362 U. S. 440); Osborn v. Ozlin (310 U. S. 53).
The provisions of section 9 are not transformed into an “ antitrust measure ” in conflict with the supremacy clause on the basis of plaintiffs ’ conception that the statute is not ‘1 a device to promote temperance ’ ’; nor are they for similar reasons in conflict with the Robinson-Patman Act (U. S. Code, tit. 15, § 13 et seq.). It is a strained argument to make, as plaintiffs do, that compliance with the compulsion of a public statute which seeks to keep down the price of liquor is the equivalent of an unlawful conspiracy to violate the Sherman Act; and it is almost equally strange to say that, because New York tries to correct an evil in the sale of liquor by providing price criteria operative here, it ‘1 will * * # impair * * * the successful operation of alcoholic beverage control laws in other states
Plaintiffs also attack the validity of portions of section 7 of the 1964 statute which require that filed price schedules show the bottle and case price paid by a retailer, and the portion of the section which prohibits sale or purchase by a wholesaler unless schedules are filed by brand owners “ irrespective of the place of sale or delivery ’ ’.
It is said by appellants that those requirements “ can only mean ’ ’ that sales by brand owners ‘1 in every state ’ ’ must be filed with the New York Authority.
The statute is concerned with New York practices and, if the sales in other States have no relevancy to New York enforcement, the statute permits the Liquor Authority for good cause to waive the general prohibition against sales to wholesalers in the absence of such schedules. It would be reasonable to expect that the statute would be administered consistently with its sole purpose to regulate the intrastate sale of liquor.
Throughout the argument of plaintiffs on constitutional and other issues runs the thread of their contention that the 1964 statute is not suited to the promotion of temperance and hence the main justification of a valid regulation of liquor is lost.
In summarizing their position in a reply brief plaintiffs say: “At issue here is whether Section 9 of Oh. 531 affirmatively *60 promotes temperance ”. As to what best promotes temperance among the people of New York it seems preferable to take the opinion of the Governor and the Legislature rather than that of the liquor industry.
The order should be affirmed, with costs.