*510 OPINION OF THE COURT
Simons, J.
 Section 101-bb of the Alcoholic Beverage Control Law prohibits the retail sale of liquor for off-premises consumption at less than “cost” — the price per bottle offered by a wholesaler to a retailer plus a 12% mark-up on that price. Petitioners, retail liquor store licensees, concede that they have sold liquor below this statutory “cost”, but contend that section 101-bb sanctions retail price maintenance in violation of the Sherman Antitrust Act (15 USC § 1 et seq.). They contend, therefore, that respondent’s charges and findings of guilt based on these sales should be annulled as unlawful. The Appellate Divisions reviewing these proceedings agreed and, in each case, rejected respondent’s contentions that the statute was protected by the State action exception to antitrust enforcement under Parker v Brown (317 US 341) or by application of the 21st Amendment. Subsidiary issues are also involved. In J.A.J. Liq. Store, the court construed the scope of the prohibition on engaging in another business on licensed premises set forth in Alcoholic Beverage Control Law § 63 (4) and found no substantial evidence petitioner had violated it and in 324 Liq. Corp., the court reviewed the validity and potential anticompetitive effect of Bulletin 471 and invalidated it. We hold that section 101-bb is a proper exercise of the State’s power under the 21st Amendment which does not conflict with the Sherman Act and that in J.A.J. Liq. Store there was no substantial evidence of a violation of section 63 (4) and we therefore modify the judgment of the Appellate Division, Second Department. We reverse the order of the Appellate Division, First Department, in 324 Liq. Corp.
I
J.A.J. LIQUOR STORE
Petitioner J.A.J. Liquor, Inc., is a licensed retailer of liquor for off-premises consumption in Hicksville, New York. On February 20,1980 respondent State Liquor Authority, the agency responsible for administering the Alcoholic Beverage Control Law, instituted a proceeding to cancel or revoke petitioner’s license based on the following two charges: first, that petitioner violated Alcoholic Beverage Control Law § 63 (4) by engaging in another business on the licensed premises and second, that on January 25, 1980 petitioner violated Alcoholic Beverage Control Law § 101-bb (2) by selling alcoholic beverages below cost to a State Liquor Authority investigator. Petitioner pleaded not guilty and *511 a statutory hearing was held before a hearing officer designated by respondent.
The evidence adduced at the hearing indicated that respondent’s investigators went to petitioner’s premises on the date alleged and purchased a bottle of Johnny Walker Red Label Scotch Whiskey for $9.50 together with a bottle of Bacardi Rum for $6.09. At the time of the sale, the minimum resale price for those products established pursuant to section 101-bb was $9.99 and $6.36, respectively. The evidence supporting the charged violation of Alcoholic Beverage Control Law § 63 (4) was that petitioner sold a stuffed animal to the investigators with a bottle of Black and White Scotch for $18. Petitioner’s president testified that he sold the liquor and stuffed animal as a gift package; that he purchased the stuffed animals for $8 each; that the retail price of the liquor was $8.99; and, that he paid an additional sum for wrapping paper and bow which accompanied the gift package. He further testified that he had never sold any of the animals separately and would never do so.
Respondent adopted the findings of the hearing officer, sustained the charges and assessed a penalty of a $2,000 fine and 20 days deferred suspension. Petitioner then instituted an article 78 proceeding contending that respondent’s determination concerning the sales of liquor below cost was unlawful because Alcoholic Beverage Control Law § 101-bb violates the Sherman Antitrust Act and that the determination that it had unlawfully engaged in another business was not supported by substantial evidence. The Appellate Division, Second Department, granted the petition, annulled respondent’s determination and dismissed the charges. It found that the statutory minimum pricing scheme for liquor embodied in Alcoholic Beverage Control Law § 101-bb was virtually indistinguishable from the parallel retail price maintenance sections for wine invalidated in California Liq. Dealers v Midcal Aluminum (445 US 97,102) and Matter of Mezzetti Assoc. v State Liq. Auth. (51 NY2d 761). Following the Midcal reasoning, the court concluded that the regulation of liquor sales under section 101-bb is not immune from antitrust legislation under Parker v Brown (317 US 341, supra) and that the 21st Amendment does not shield the State from the antitrust laws. The court also ruled that respondent’s determination that petitioner violated Alcoholic Beverage Control Law § 63 (4) by engaging in another business on the licensed premises was not supported by substantial evidence.
324 LIQUOR CORP.
Petitioner 324 Liquor Corp. was also charged by respondent with violating Alcoholic Beverage Control Law § 101-bb arising *512 from the sale of liquor for off-premises consumption at a price less than cost. A statutory hearing was convened at which the parties stipulated that a Liquor Authority investigator purchased two bottles of liquor at petitioner’s premises, a 1.75 liter bottle of Chatham Gin for $9.45 and a 1.75 liter bottle of Smirnoff’s Vodka, 80 proof, for $11.59, at a time when the minimum consumer retail price was $9.65 for Chatham Gin and $11.89 for Smirnoff’s Vodka. Respondent sustained the charge and imposed a penalty of 10 days suspension plus a $1,000 bond forfeiture. Petitioner then commenced an article 78 proceeding to review and annul respondent’s determination on the ground that the minimum retail pricing scheme for liquor violates the antitrust laws. Petitioner also contended that respondent acted ultra vires in promulgating its rule 16 (9 NYCRR 65.4), which requires that the price per bottle must exceed the price per case in which it is contained by $1.92 divided by the number of bottles in the case, because it lacks the statutory authority to compel wholesalers to add any amount to their prices. Further, petitioner maintains that respondent exceeded its statutory powers by issuing Bulletin 471. That Bulletin permits wholesalers to “post-off” or reduce the legal case price in any month without fully passing through the “post-off” to the consumer on the bottle price. Thus, petitioner alleges that Bulletin 471 allows wholesalers to offer quantity discounts for the benefit of the retailer in excess of those permitted by Alcoholic Beverage Control Law § 101-b. Special Term rejected each of petitioner’s claims and dismissed the petition. The Appellate Division, First Department, reversed and annulled respondent’s determination, ruling that section 101-bb was a price maintenance scheme which violated the Sherman Antitrust Act. It further held that Bulletin 471 improperly granted wholesalers the authority to determine if price reductions made during “post-off” periods should be passed through on single bottle prices and thereby encouraged private price maintenance. The court did not reach the issue of whether respondent acted ultra vires in promulgating rule 16.
On these appeals, respondent State Liquor Authority contends that Alcoholic Beverage Control Law § 101-bb does not violate the Sherman Act because the antitrust law condemns concerted action in the nature of “contracts], combination[s] * * * or conspiracies]” which unreasonably restrain trade (15 USC § 1), not minimum mark-up price provisions of State law which do not compel anticompetitive activity. Alternatively, respondent maintains that this issue is not determinative because section 101-bb is exempt from challenge under the “State *513 action” immunity doctrine enunciated in Parker v Brown (317 US 341, supra), and that it is otherwise protected under the 21st Amendment.
II
The statutory provision in issue on this appeal was originally enacted in 1964 as part of a sweeping revision of our liquor laws based upon recommendations made by a specially appointed Moreland Commission. These statutes attempt to balance price protection for consumers on the one hand and to prevent retail licensees from obtaining unfair advantage over their competitors on the other. The consumers are protected by price affirmation and posting requirements intended to keep New York’s prices in line with those of other States. Small retailers are protected by regulations governing minimum pricing, wholesale discounts and other means of obtaining competitive advantage so that the large dealers may not drive the small ones out of business. Thus, at the initial stage in the distribution process, manufacturers and distillers are required to file monthly schedules with the Liquor Authority which include their prices to wholesalers. Each manufacturer or distiller must file with the schedules an affirmation stating that the prices charged are no higher than the lowest prices charged wholesalers in any other State (Alcoholic Beverage Control Law § 101-b [3] [a], [d]; see, Seagram & Sons v Hostetter, 384 US 35, affg 16 NY2d 47 [requirement that liquor prices to domestic wholesalers be as low as prices offered elsewhere in the country held not to violate the Supremacy Clause or to conflict with the Sherman Act or the Robinson-Patman Act]; Matter of Brown-Forman Distillers Corp. v State Liq. Auth., 64 NY2d 479 [decided herewith]). Thereafter, the wholesaler is free to fix the prices of the brands without statutory control, but it must also file schedules with the Liquor Authority each month which set forth its “case” and “bottle” price to retailers for all brands it markets (Alcoholic Beverage Control Law § 101-b [3] [b]). Within 10 days after the filing, the Authority must make the schedules or a composite of them available for inspection by other licensees and within three days after the date provided for such inspection, a wholesaler may amend its filed schedule for sales to retailers in order to meet lower competing prices and discounts “provided such amended prices are not lower and discounts are not greater than those to be met” (Alcoholic Beverage Control Law § 101-b [4]). This is a constitutionally permissible price-posting statute which does not authorize anyone to determine prices which bind others in violation of the Sherman Antitrust Act (see, Matter of *514 Admiral Wine & Liq. Co. v State Liq. Auth., 61 NY2d 858; Battipaglia v New York State Liq. Auth., 745 F2d 166 [2d Cir, Sept. 21, 1984], cert denied_US_, 105 S Ct 1393).
Exercising its statutory authority to reduce prices to meet competition (see, § 101-b [4]), respondent also has issued Bulletin 471 which permits wholesalers to temporarily “post-off” on, or reduce, the case price. They may also “post-off” on the bottle price at the previous list price or at a price which is proportionately equivalent to the reduction in the case price. At the end of the “post-off” period, the wholesaler may return to but not exceed the “legal” maximum price reflected in the schedule filed with respondent.
Finally, section 101-bb, the section challenged on this appeal, provides for a legal minimum retail price. It prohibits retailers selling for off-premises consumption from selling below “cost”. The cost or legal minimum retail price, however, is the “bottle price” filed by the wholesaler in the month the retailer makes a sale plus 12% of that “bottle price”, a constant which reflects “the average minimum overhead necessarily incurred in connection with the sale by the retailer of such item of liquor” (Alcoholic Beverage Control Law § 101-bb [2] [b]).[1] Section 101-bb (3) permits retailers to charge less than cost, however, after obtaining prior written permission from the Liquor Authority and after establishing good cause for doing so. This section was designed to protect small retailers from unfair competition (see, Alcoholic Beverage Control Law § 101-bb [1]).
Petitioners specifically challenge the validity of section 101-bb but the implications of this litigation are much broader than *515 the attempt to invalidate that section. If they are successful liquor prices will be deregulated and other statutory provisions designed to protect small retailers from unfair competition such as those specifying the maximum discounts permitted by law (§ 101-bb [2] [b]), prohibiting wholesalers from granting discriminatory discounts, prohibiting wholesalers from granting free merchandise or other inducements (§ 101-b [2] [b]; cf. Matter of Brown-Forman Distillers Corp. v State Liq. Auth., 64 NY2d 479 [decided herewith], supra), and provisions limiting the credit period afforded to retailers by wholesalers (§ 101-a [2]) will lose much of their force.
*514 “2. No licensee authorized to sell liquor at retail for off-premises consumption shall sell, offer to sell, solicit an order for or advertise any item of liquor at a price which is less than cost. As used in this section, the term:
“(a) ‘liquor’ shall mean liquor bearing a brand or trade name, and of like age and quality, which has been duly registered with and approved by the liquor authority pursuant to section 107A of this chapter, and “(b) ‘cost’ shall mean the price of such item of liquor to the retailer plus twelve percentum of such price, which is declared as a matter of legislative determination to represent the average minimum overhead necessarily incurred in connection with the sale by the retailer of such item of liquor. As used in this paragraph (b) the term ‘price’ shall mean the bottle price to retailers, before any discounts, contained in the applicable schedule filed with the liquor authority pursuant to section one hundred one-b of this chapter by a manufacturer or wholesaler from whom the retailer purchases liquor and which is in effect at the time the retailer sells or offers to sell such item of liquor; except, that where no applicable schedule is in effect the bottle price of the item of liquor shall be computed as the appropriate fraction of the case price of such item, before any discounts, most recently invoiced to the retailer.”
*515 ¡II
Turning to the merits of the appeals, a preliminary determination must be made whether “State action” immunity or the 21st Amendment insulates section 101-bb from challenge under the antitrust laws. If either doctrine applies, the State enactment must be sustained and it is unnecessary to determine whether section 101-bb violates the antitrust laws.
A. State action Immunity under Parker v Brown
Parker v Brown (317 US 341, supra) involved an antitrust challenge to a California statute authorizing collective raisin marketing programs which eliminated pricing competition among producers. In upholding the marketing program, the Supreme Court noted that the challenged restraint derived from statutory command, not from any agreement among private persons, and it held that the Federal antitrust laws do not prohibit a State “as sovereign” from imposing certain anticompetitive restraints “as an act of government” (id., at p 352). Two standards must be met before this State action immunity attaches: first, the challenged restraint must be “ ‘one clearly articulated and affirmatively expressed as state policy’ and second, the policy must be “actively supervised” by the State itself (see, California Liq. Dealers v Midcal Aluminum, 445 US 97, 105, supra). The Appellate Divisions held the immunity inapplicable in the appeals before us because the statutory scheme which permitted liquor prices to be set by wholesalers without any control by the State did not satisfy the active supervision requirement. We agree with those rulings.
In Midcal (supra), the Supreme Court reviewed a challenge to California’s system of resale price maintenance for wine. Under the California statutory scheme, wine producers, wholesalers or rectifiers were required to file fair trade contracts or price schedules with the State, and no licensed wine merchant was *516 allowed to sell wine to a retailer at a price other than that set forth in the filed contract or schedule (Cal Bus & Prof Code Ann §§ 24862, 24866). The prices were set in the first instance by the producers, wholesalers or rectifiers, and the State exercised no regulatory control over them. In applying the Parker criteria, the court found that although the requirement that the restraint be expressed as State policy was satisfied by the statutes themselves, the second requirement of the test had not because the State merely authorized price setting without exercising control or review over the prices established (California Liq. Dealers v Midcal Aluminum, supra, at pp 105-106). Having determined that no State action antitrust immunity was available, the court held that California’s wine pricing system constituted resale price maintenance which violated the Sherman Antitrust Act (id., at p 103).
New York’s pricing system for liquor similarly satisfies the first requirement of the test because the State policy of promoting the orderly distribution of liquor is “clearly articulated and affirmatively expressed” in the statute itself (Alcoholic Beverage Control Law § 101-bb [1]). As with California, however, New York does not actively supervise resale prices under its system of price maintenance. Liquor prices are set by the wholesalers and the State has no power to change the prices or review their reasonableness.
To contrast Connecticut’s liquor price maintenance system has been held immune from the Sherman Act under the State action doctrine (Morgan v Division of Liq. Control, 664 F2d 353, affg 512 F Supp 936). Unlike contrast to the California and New York statutes, the Connecticut statute creates a tripartite pricing system by which the manufacturer or out-of-State shipper unilaterally establishes and files its offering price but the State then regulates the mark-ups allowed to the wholesaler and to the retailer. The wholesaler’s prices cannot be less than its “cost”, which is defined as actual cost from the manufacturer and such charges as transportation, insurance and a minimum mark-up of 11% on hard liquor, 20% on beer, 20% on wine not bottled in Connecticut, and 36% on wine bottled in Connecticut (Conn Gen Stat §§ 30-68, 30-68e, 30-68J), and retailers may not sell below their “cost”, which is defined as the retailer’s “bottle price” from the wholesaler plus a mark-up of 21.5% on spirits, 28% on cordials, 23% on beer, and 33.3% on wine (Conn Gen Stat §§ 30-68b, 30-68j). Although the manufacturer’s prices are uncontrolled, the Morgan court found Parker’s active supervision requirement satisfied by the Connecticut statute because the *517 State participated in the anticompetitive activity by strictly regulating the “cost” at which both the wholesaler and the retailer could mark-up and sell their products.
B. Twenty-First Amendment
Section 1 of the 21st Amendment repealed the 18th Amendment’s prohibition on the manufacture, sale or transportation of liquor. Section 2 provides that: “The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.” The amendment, by its terms, gives the States broad regulatory powers over liquor traffic within their territories and that control “logically entails considerable regulatory power not strictly limited to importing and transporting alcohol” (California Liq. Dealers v Midcal Aluminum, 445 US 97, 107, supra; California v LaRue, 409 US 109; Seagram & Sons v Hostetter, 384 US 35, 42, supra; United States v Frankfort Distilleries, 324 US 293, 299). Because the States have the power to prohibit absolutely the manufacture, sale or possession of intoxicants within their borders, they may permit those acts only under carefully prescribed conditions. “The greater power includes the less[er]” (Ziffrin, Inc. v Reeves, 308 US 132,138). Notwithstanding the “wide latitude” granted them by the 21st Amendment, however, important Federal interests have survived its ratification (Seagram & Sons v Hostetter, supra, at p 42). Specifically, Congress has retained authority to regulate interstate commerce in liquor under the Commerce Clause (see, Bacchus Imports v Dias, 468 US —, —, 82 L ed 2d 200, 211-212; Hostetter v Idlewild Liq. Corp., 377 US 324, 332), and that Commerce Clause authority may also be exercised by enforcement of the antitrust laws (California Liq. Dealers v Midcal Aluminum, supra). There is no bright line dividing the areas of State and Federal primacy, “[b]oth the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution. Like other provisions of the Constitution, each must be considered in the light of the other, and in the context of the issues and interests at stake in any concrete case” (Hostetter v Idlewild Liq. Corp., 337 US, at p 332, supra). The court must analyze “ ‘whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail’” notwithstanding a conflict between its provisions and Federal policies (Bacchus Imports v Dias, supra, at p —, at p 212, quoting Capital Cities Cable v Crisp, 467 US_, 81 L ed 2d 580).
*518 This interest analysis was applied in California Liq. Dealers v Midcal Aluminum (supra), and by the California Supreme Court in Rice v Alcoholic Beverage Control Appeals Bd. (21 Cal 3d 431, 579 P2d 476). In Rice, the California court invalidated a statute establishing resale price arrangements for distilled spirits as in violation of the Sherman Antitrust Act, holding that neither the State action exception nor the 21st Amendment provided a basis to uphold that State’s fair trade laws. (Significantly, the California statutes do prohibit sales below cost [see, 21 Cal 3d 431, at p 458, 579 P2d, at p 494]). In applying interest analysis to determine the applicability of the 21st Amendment, it ruled that the stated purposes of California’s liquor price maintenance laws were to promote temperance and orderly market conditions. Reviewing the evidence offered in support of these aims, the court concluded that the law had no impact on temperance and that it adversely affected market conditions. It based its decision in part on a report of the California Senate Committee which stated that the price maintenance system “has resulted in the elimination of any semblance of competition within the industry” resulting in higher retail prices (1 Sen Select Comm Rep on Laws Relating to Alcoholic Beverages, at 9 [1974]). Thus, the court held that the asserted State interests were not furthered by California liquor price maintenance laws and, in contrast, that the Federal policy of promoting competition which underlies the Sherman Act was clearly violated (see, Northern Pac. Ry. Co. v United States, 356 US 1, 4-5). Balancing the strong Federal policy against the weakly supported State interests, the court concluded that the Federal interest predominated and that the 21st Amendment did not bar application of the Sherman Act.
In Midcal, the Supreme Court relied upon the California court’s decision in Rice and found that the 21st Amendment did not bar application of the antitrust laws to California’s wine industry. It explicitly refrained from deciding “whether the legitimate state interests in temperance and the protection of small retailers ever could prevail against the undoubted federal interest in a competitive economy” (445 US, at pp 113-114; see also, United States v Frankfort Distilleries, 324 US 293, 299, supra [in which defendants were convicted of illegal price fixing under the Sherman Act because there was no regulatory State act which conflicted with the Federal statute], and esp concurring opn of Frankfurter, J., at pp 300-303).
New York’s experience in regulating alcoholic beverages has been markedly different from that of California. The legislative *519 history of section 101-bb forcefully demonstrates that an important reason for its enactment and amendment to its present form was to protect small retailers and the number of retail liquor outlets selling for off-premises consumption. The statute was first enacted following widespread charges of corruption and abuse which prompted a Moreland Commission investigation into irregularities in the administration of New York’s Alcoholic Beverage Control laws. At the conclusion of its investigation, the Commission published five Study Papers in which it proposed extensive revision of the existing statutes. The Commission’s major findings were that New York consumers suffered from serious price discrimination when compared to liquor consumers in other States and that a severe lack of competition existed in the New York retail market. It proposed that changes be made in the method of regulating retail prices, that more retail licenses be issued for off-premises consumption, that artificial restrictions on the location and transfer of licensed retail stores be eliminated and that inhibiting restrictions on their operation be reduced (for a general background of this history and of the Commission’s findings and recommendations see, Seagram & Sons v State Liq. Auth., 16 NY2d 47, affd 384 US 35, supra; Matter of Hub Wine & Liq. Co. v State Liq. Auth., 16 NY2d 112; Matter of Great E. Liq. Corp. v State Liq. Auth., 30 AD2d 307, 309, affd 25 NY2d 525; Moreland Commission Report, 1964 NY Legis Ann, at 484-489; Statement by Governor Rockefeller on April 12, 1964, 1964 NY Legis Ann, at 403-408). Paradoxically, the principal purposes of the legislation resulting from these proposals and which is now challenged on antitrust grounds were the same as those underlying the Sherman Act — to promote market competition and protect consumers.
Section 101-bb (L 1964, ch 531) was enacted as a result of these proposals. It expressed the legislative determination that “the declared policy of the state” was to regulate and control the manufacture, sale and distribution of liquor within the state and to “eliminate retail sales of liquor at less than cost” (Alcoholic Beverage Control Law § 101-bb [1]). The validity of the statute was affirmed by this court and by the Supreme Court (Seagram & Sons v Hostetter, 16 NY2d 47, affd 384 US 35, supra).
By 1971 it had become apparent that further amendment was needed to protect small retailers because hundreds of package stores were being forced out of business by the predatory pricing practices of large discount dealers (see, 1971 NY Legis Ann, at 80-82; cf. Safeway Stores v Oklahoma Grocers, 360 US 334; Nebbia v New York, 291 US 502). The Excise Committee of the *520 New York Senate investigated the situation and found that after the 1964 revisions there was an inordinate and continuing emphasis on price cutting and price promotions in the industry, that the continued employment of “lossleader” selling had resulted in a rapidly accelerating concentration of volume in the hands of a relatively few stores, and that this concentration interfered with the attainment of “normal” competition and threatened the survival of the entire retail economy of the liquor industry. The Committee’s Final Report stated: “Since it seems patent that the mass of small retailers are unable to compete with the large volume outlets that have emerged, most appear doomed barring the adoption of some formula that will permit the co-existence of both types of outlets. This leaves New York’s consumers facing the future prospect of being relatively poorly served only by mass merchandisers” (NY State Legis, Senate Excise Committee, Final Report of the Senate Excise Committee, April 5,1971, at 29-30, as quoted in House of Spirits v Doyle, 72 Misc 2d 1036, 1040). Although these practices produced temporary price reductions to the consumer, but the benefits could prove transitory, threatening to drive small retailers out of business and consolidating control of the market in the hands of a relatively few mass distributors who could then dictate prices to the ultimate injury of consumers and market competition generally.
The Legislature responded to this threatened danger by enacting the minimum mark-up amendment to section 101-bb (L 1971, ch 191). It was expressly designed to preserve competition in New York’s retail liquor industry by stabilizing the retail market and protecting the economic position of small liquor retailers. We approved the amendment and recognized the important public policy which prompted it when we affirmed House of Spirits v Doyle (72 Misc 2d 1036, affd 43 AD2d 880, affd 36 NY2d 815). There have been criticisms of the statute since 1971 and efforts to repeal it, as the dissent notes, but the Legislature has refused to do so and indeed has considered amendments seeking to increase the permitted minimum mark-up (see, 1984 NY Legis Record and Index, S 6541).
This history demonstrates New York’s commitment to protect its small retailers and the investigative determinations upon which the statutes intended to do so are premised. Having experienced problems in the intrastate retail liquor market, the Legislature exercised its powers under the 21st Amendment to correct them. The statute in question responds to this perceived State interest and is thus distinguishable from the California *521 statutes considered in the Rice and Midcal decisions. Additionally, we note that New York’s history and experience have dictated that if the consumer of alcoholic beverages in this State is to be protected from inflated prices and to enjoy the benefits to be derived from market competition, then the regulatory provisions in section 101-bb and related sections best serve that purpose.[2] Inasmuch as those charged with enacting and enforcing the laws in this area of State responsibility have identified the statute as embodying an important public policy that policy should prevail over the generalized concerns of the Sherman Antitrust Act (see, Battipaglia v New York State Liq. Auth., 745 F2d 166, 178-179 [2d Cir, Sept. 21, 1984], cert denied _ US _, 105 S Ct 1393, supra).
Matter of Mezzetti Assoc. v State Liq. Auth. (51 NY2d 761, supra), which invalidated parallel pricing provisions for wine (Alcoholic Beverage Control Law § 101-bbb) does not require a different result. New York has historically regulated traffic in distilled spirits strictly. Implicit in the brief Mezzetti decision, however, was a recognition that the degree of protection New York has accorded its wine industry is not significantly different from that in California as reviewed in the Midcal decision. Thus, all liquor distillers and manufacturers must meet statutory affirmation requirements and file price schedules (Alcoholic Beverage Control Law § 101-b [3] [d]), but wine dealers need not file affirmations and they are permitted exceptions to the price schedule requirements (Alcoholic Beverage Control Law § 101-bbb [3] [d]). Wineries may sell wine at retail at any time (9 NYCRR 63.6), they may sell in bulk to persons outside the State (Alcoholic Beverage Control Law § 77) and they may manufacture other products and carry on other related business on the *522 licensed premises (Alcoholic Beverage Control Law § 77 [4]). Indeed, New York recently enacted legislation permitting wine products to be sold in grocery stores (L1984, ch 502) and broadly expanding the retail sale privileges accorded wineries (L 1984, chs 500-505). Liquor stores enjoy none of these advantages, which evidence a clear recognition by the Legislature that the need to protect wine sellers from unfair competition does not require the intensive regulation and control requirements that the liquor industry generally requires. Indeed, one of the principal arguments in support of the newly enacted wine-marketing bills was that the industry needed economic encouragement through greater deregulation if it was to survive (see, Governor’s Memorandum, 1984 McKinney’s Session Laws of NY, at 3607).
Accordingly, we conclude not only that the State interest in protecting retailers which underlies our statutes is of sufficient magnitude to override the Federal policy expressed in the antitrust laws, but also that the State policy of regulating prices to protect consumers and maintain extensive retail outlets is consistent with the Federal statutes. We hold, therefore, that the 21st Amendment shields the State from the provisions of the Sherman Antitrust Act and in view óf our holding, that portion of respondent’s determination in each case which found petitioners to have violated section 101-bb must be reinstated.
IV
In J.A.J. Liq. Store, the Appellate Division concluded that respondent’s determination that petitioner had engaged in another business on the licensed premises was not supported by substantial evidence. We agree with that portion of the Appellate Division’s decision.
Alcoholic Beverage Control Law § 63 (4) provides that “[n]o licensee under this section shall be engaged in any other business on the licensed premises.” The statute is intended to prohibit a separate profit generating business. Thus, in Matter of Anchor Liqs. v State Liq. Auth. (31 AD2d 812), the court held that there was substantial evidence of a violation of the statute because petitioner ran a complete catering service on the licensed premises. The uncontroverted evidence in this proceeding established that petitioner was not engaged in the business of selling stuffed animals because the animals were sold only as part of gift packages of liquor and the sale of the animals themselves did not generate a profit.
V
In 324 Liq. Corp., the First Department viewed State Liquor Authority Bulletin 471 as giving wholesalers the power to set *523 minimum mark-ups above 12% and it invalidated section 101-bb partially because of that finding. The court also held Bulletin 471 was invalid because its provisions exceeded respondent’s authority.
Preliminarily, the Appellate Division erred in using the purported anticompetitive effect of Bulletin 471 as a basis for invalidating section 101-bb. Constitutional problems created by a regulation should be resolved by invalidation of the regulation alone, not invalidation of both the statute and regulation (cf. Loretto v Teleprompter Manhattan CATV Corp., 58 NY2d 143, 154) In addition, the Bulletin is a proper exercise of the Liquor Authority’s rule-making power under Alcoholic Beverage Control Law § 101-b (3) (b) and Alcoholic Beverage Control Law § 101-b (4).
Bulletin 471 allows individual wholesalers to decide whether to “post-off” reductions on case prices accompanied by corresponding reductions in bottle prices. In some situations, the wholesaler may choose to grant a smaller price reduction on the bottle price, or no reduction at all. This practice is consistent with Alcoholic Beverage Control Law § 101-b (3) which does not mandate any price ratio between scheduled case and bottle prices.
The Appellate Division concluded that the Bulletin is invalid, in part, because it permits a “post-off” on a case which is not followed by an equivalent “post-off” on a bottle price with the result that a retailer may charge a mark-up in excess of 12%. Bulletin 471 does not authorize such a practice. In reselling a bottle of liquor which was purchased by the retailer as part of a full case, the minimum mark-up price is derived from the statute by referring to the scheduled bottle price and adding 12%, rather than by dividing the case price by the number of bottles in the case and then adding 12% to each bottle to be individually resold. As a result, the “post-off” price of a bottle of liquor is the governing figure, not the case price. A retailer pays the scheduled post-off price regardless of the number of cases or bottles purchased.
Accordingly, in Matter of J.A.J. Liq. Store v State Liq. Auth., the judgment of the Appellate Division should be modified, with costs to appellant, and the matter remitted to Supreme Court, Nassau County, with directions to remand to the State Liquor Authority for further proceedings in accordance with this decision and, as so modified, the order is affirmed.
In Matter of 324 Liq. Corp. v McLaughlin, the order of the Appellate Division is reversed, with costs, and judgment of Supreme Court, New York County, reinstated.

. The section states:

. On the important matter of price regulation, the Commission noted that under the former statute the manufacturer was permitted to fix the price of liquor and the retailer could not sell it for less (Alcoholic Beverage Control Law former § 101-c). The assumption behind this law was that high prices promoted temperance. The Commission’s studies led it to believe, however, that the assumed favorable relation of high-priced liquor to temperance did not exist (Moreland Commn Report No. 1, at 3,17). The principal benefit from the statutory price provision went to the liquor interests who, after setting their own prices, had them enforced by State investigators. This regulation, the Commission said, served only “to insure the profit margins of the various segments of the industry” (Report No. 3, at 19). Moreover, the Commission found gross price discrimination against the New York consumer by the industry. Indeed, it found that the retail price for a fifth of a well-known brand of liquor was lower in Washington, D.C. than the wholesale price in New York (see, Report No. 3, at 5,6). “For almost every fifth of whiskey that he buys”, the Report stated, “the New York consumer pays from 50 cents to $1.50 more than the price at which it is available in at least seven freer price markets” (id., at 3).